### DAVID A. BRAYTON *vs*. CITY OF FALL RIVER.

A city constructing a system of sewers, into which private persons have a right to drain, in such a manner that the wash and the dirt from the streets are conveyed into a tide water dock and create an obstruction constituting a private nuisance, is liable to an action therefor.

The owner of a wharf upon a tide water creek cannot maintain an action for an illegal obstruction to the creek, this being a common damage to all who use it; but for an obstruction adjoining the wharf which prevents vessels from lying at it in the accustomed manner, this being a particular damage, he can maintain an action.

TORT. The declaration contained three counts. The first was as follows :

" And the plaintiff says he is the owner of a certain wharf with a dock appurtenant thereto, situate on Fall River Creek, so called, in Fall River, bounded," &c., " and that he is entitled to use, maintain, and enjoy the same with its appurtenances, and that the defendants by means of large drains or sewers turned, directed, and caused to be emptied into said Fall River Creek and the Fall River Stream emptying into the same a very short distance above the plaintiff's said dock and wharf large quantities of gravel, sand, stones, sediment, dirt, and filth, and has continued and still continues so to do, and that the same lodged, gathered, and accumulated, and still continues so to do, in the plaintiff's said dock, thereby diminishing the depth of water at said wharf and filling up said dock, and putting the plaintiff to great expense to remove the same and to employ lighters to load and land cargoes at his said wharf ; to the very great injury of the plaintiff, and of his privilege and rights aforesaid, and of the enjoyment of the same, and of his dockage and wharfage facilities."

The second count was like the first except that it charged that the defendants " wrongfully " did the acts complained of. The third count was like the second, except that it charged that the defendants constructed the sewers, and that they were " improperly and wrongfully constructed."

The answer was as follows :

" And now come the defendants and deny that the sewer and drain mentioned in plaintiff's declaration, or either of them,

are wrongfully or improperly constructed, turned, directed, or caused to be emptied into the Fall River Creek and Fall River Stream as alleged in the plaintiff's declaration, and deny that they are liable to the plaintiff for any damage caused thereby; they also deny that any damage is so caused thereby as alleged in said declaration, and deny that there is any gravel, sand, stones, sed·iment, dirt, or filth lodged, accumulated or filled into the dock or at the wharf of the plaintiff, or that the water is diminished in depth at the wharf or dock of the plaintiff thereby. And they further say, that if ever they made any drains or sewers as alleged, that the same were made by virtue of the authority vested in them by law for the establishment, protection, and repair of their drainage system, and their sewers and streets.

" And they further deny each and every allegation of the plaintiff in his said declaration."

At the trial in the Superior Court, before *Devens*, J., the plaintiff proved title to the wharf and to a portion of the creek adjoining. He then put in evidence the following orders of the mayor and aldermen of Fall River:

" November 21, 1859. Ordered, That the superintendent of streets and highways cause to be constructed a culvert across Central Street, near its intersection with Davol Street, and that the wash of said street be conducted to and upon the lot recently purchased of Mrs. Lydia Ruggles, and that he also cause a cesspool to be constructed on said lot, in manner to receive said wash and to prevent as far as may be the flow of sand and gravel into the creek."

" July 2, 1860. Ordered, That the superintendent of streets and highways cause to be constructed near westerly end of Elm Street, a drain to connect with drain across Central Street, in manner to take the wash of said Elm Street by said drain to the cesspool on land near the creek belonging to this city."

The plaintiff further put in evidence this order of the city council:

" April 23, 1866. Ordered, That the committee on highways and bridges consider the expediency of constructing a sewer during the present season, through Central Street from Main to

Davol Street, and report thereon at the next meeting of the city council, stating the probable expense thereof."

And the following report of the committee with proof of the adoption of the order by it recommended :

" May 7, 1866. The committee on highways and bridges, to whom was referred the subject of building a sewer in Central Street, reported, and recommended the adoption of the following order : " Ordered, That the superintendent of streets be, and he is hereby, instructed to cause a sewer of suitable dimensions to to be constructed, commencing at or near the corner of Main and Central Street and extending through Central to Davol Street, the cost not to exceed fifteen thousand dollars and the same to be charged to sewerage account."

Also the following order passed by the city council :

" July 20, 1866. Ordered, That a common sewer, connecting with the sewer recently constructed in Central Street, be constructed in North Main Street, to be extended as far north in said Main Street as the unexpended balance of the appropriation heretofore made for the sewer in Central Street will warrant, the same to be constructed under the general direction and supervision of the superintendent of streets."

Also the following orders of the board of aldermen :

" July 6, 1870. Ordered, That the committee on construction and repairs of highways consider the expediency of constructing a sewer in South Main Street from Morgan to Pocasset Street."

" July 11, 1870. Ordered, That the committee on construction and repairs of highways consider the expediency of causing to be constructed a sewer in Elm Street from the east end of the sewer in said street to Green Street, and report."

Also the following report accepted, and order adopted, by the board of aldermen :

" July 18, 1870. The committee on construction and repairs of highways, to whom was referred the orders relating to sewers for South Main and Elm streets, reported, and presented the following order : Ordered, That the superintendent of streets be, and he is hereby, authorized, under the direc-

tion of the committee on construction and repairs of highways, to construct sewers in South Main Street from Rodman to Pocasset Street, and on Elm Street from, and in continuation of, the sewer at the lower end of the said street to Green Street, said sewers to be constructed in such manner and of such dimensions and of such material as in the judgment of said committee will best serve the purpose of their construction — the cost thereof to be paid from the appropriation for sewers, and that abuttors be charged such proportion of said expense as may hereafter be determined by this board."

Also the following orders passed by the board of aldermen :

" August 22, 1870.    Ordered, That the superintendent of streets cause a suitable sewer to be built through Pocasset and Annawan streets from Main to Canal Street, under the direction of the committee on construction and repairs of highways, and that the expense thereof be charged to the appropriation for sewers."

" September 14, 1871.    Ordered, That the superintendent of streets be, and he is hereby, instructed to cause a sewer to be constructed from the easterly terminus of the sewer now in Elm Street through Elm Street to Main Street, through Main Street to Franklin Street and through Franklin Street to Rock Street — said sewer to be built of brick and in accordance with a plan drawn by Benjamin C. Borden and herewith submitted — the cost to be charged to appropriation for sewers, and the abuttors to be assessed their proportion of the expense, in accordance with chapter 29 of City Ordinances."

The plaintiff also proved the acceptance by the city of the provisions of sections 3, 4, 5, 6, of chapter 48 of the General Statutes.

It appeared that the plaintiff's premises were situated on the easterly side of a narrow creek, called the Fall River Creek, the tide water of which extended but a short distance above the plaintiff's premises, and in which the tide rose and fell between five and six feet.    Into the head of this creek emptied Fall River, which was the outlet of the Watuppa ponds, and by which eight or ten factories were run.    No business was done on the creek

above the plaintiff's premises except the wintering of boats, there being a bridge across it at the south side of the plaintiff's property, which bridge constituted a part of Central Street. The plaintiff derived his title to one half of the premises described in the declaration from David Anthony and from Richard Borden, by deeds dated respectively December 26, 1859, and January 21, 1854, and to the other half from the Pocasset Manufacturing Company by deed dated September 1, 1856. On the portions conveyed by Anthony and by Borden, which were the south portions adjoining the bridge, there was a wharf which extended between 70 and 80 feet northerly down the creek from the bridge, and which the testimony tended to show was an old wharf 35 or 40 years ago. From the northwest corner of this wharf to the north line of the plaintiff's premises it appeared that a wharf was built in 1844 or 1845 (while the premises were owned by the Pocasset Manufacturing Company) along the easterly side of the creek, forming a continuous wall or wharf from the bridge or south line of the plaintiff's premises to Slade's Wharf, or the north line of his premises. It appeared, that from the time of the building this wharf down to the time of bringing the suit there had been no alteration along the front line of the entire wharf from the bridge to Slade's Wharf, except to make it a little higher by putting on cap stones and filling in up to the level of them, and that the same had been used by the plaintiff and his grantors from 1844 or 1845 down to the present time.

It appeared also, that the Fall River Iron Works Company owned along the site of the creek opposite to the plaintiff's premises, and that their property was wharfed out on the creek.

It further appeared that on the same side of the creek as the plaintiff's premises, and but a little distance from them, to the south of, or above the bridge, on the edge of the creek, was a sand-catcher 6 or 7 feet deep and from 15 to 17 feet square, into which the water and other material gathered by the Central Street, North Main Street, Elm Street, and Franklin Street sewers were conducted, and that any overflow therefrom went into the creek. There was testimony tending to show that in heavy rains the sand-catcher filled up and flowed over into the creek with con-

siderable force. It also appeared that a little to the south of the sand-catcher, and but a short distance to the south of the plaintiff's premises, the Pocasset Street, Annawan Street, and South Main Street sewers emptied the contents gathered by them directly into the creek, and that in heavy rains the volume discharged was very considerable. The testimony tended to show that at intervals the traps and the sand-catcher were cleared out by the superintendent of streets ; that the territory that naturally drained into the creek to the south of and above the plaintiff's wharf, embraced from 15 to 20 acres, and that that now drained into it by means of the sewers was from 60 to 75 acres.

It appeared that there were openings into the sewers from the gutters in the streets, at frequent intervals, through which openings the water was led from the streets into the sewers, and that the water in passing into the sewers from the gutters passed through traps so constructed as to retain the sand, gravel, dirt and filth carried into them by the water until it had filled up the traps to the aperture through which the water flowed from the trap into the sewer, that then the trap ceased to retain any more, but permitted it to pass into the sewers, and thence into the creek.

The plaintiff contended, and introduced evidence tending to show, that the sewers, traps and sand-catchers might be so managed and controlled as substantially to prevent the escape of any sand therefrom into the creek, and in this connection offered to show that for a considerable time after the date of the writ many of the traps and sand-catchers had been full, and that the same care had been taken of them before as since the bringing of the action, but the court excluded the testimony.

It appeared that Fall River had largely increased in size within three or four years ; that within that time fifteen first-class factories had been established there ; that the teaming upon Central, Annawan, and Pocasset streets had much increased ; that none of the streets were paved ; that the disturbance of the road beds would have been greater without than with the sewers ; that the sewers divided the force and the quantity of wash, saved all that they could hold, and were to that extent protections for

the creek, and that all the streets containing sewers were ancient streets.

It further appeared that the plaintiff began to do business on his premises in 1851, and that the depth of water at his wharf then, at an ordinarily high tide, was about 10 feet; that it so remained till about 1856 or 1857, when it began to shoal, and gradually diminished to about 7 feet in 1860, in the summer of which year the plaintiff had the creek dug out at his wharf to 12 feet depth of water at an ordinarily high tide; that the water continued of that depth for between two and three years, when it began to shoal and had decreased in depth in the summer of 1864 to about 7 feet, when the plaintiff again dug out the creek to the depth of 12 feet at ordinarily high water; that in the summers of 1868, 1870, and 1872 he again dug it out, digging each time to 12 feet depth of water, the dock having shoaled each time to about 7 feet depth of water; that after the digging out in the summer of 1870, during the summer and early part of the fall of 1871, the plaintiff's dock filled up between 2 and 3 feet; that the digging extended each time along the whole wharf, and that the place dug was 40 or 50 feet wide; that the material taken out consisted of sand and gravel; that the filling was much more rapid during the latter part than during the earlier part of the plaintiff's occupation; that in 1844 or 1845 the depth of water was about 10 feet, and that there was no digging out till 1860 by any one; that the dock began to fill at a point about 10 feet north of the plaintiff's south line, and reached its highest point of filling a short distance to the north of the plaintiff's elevator, and from that point sloped gradually to the north or outer end of the creek. The plaintiff paid for digging out to the west or outer end of Slade's Wharf, about 100 to 150 feet beyond his line, in 1872, $2270; in 1870, $1070; in 1868, $670; in 1864, $650; and in 1860, $1600. It appeared also that upon the premises in question the plaintiff carried on the flouring and grain business, and had done so since 1851, grinding from 225,000 to 275,000 bushels of grain annually, which was brought to him in vessels; that during the time the water in the creek was gradually shoaling, and in conse-

quence of the shoaling, vessels bringing grain to him frequently ran aground in the creek opposite his land, and were hauled by him to a point as near his elevator as possible; in doing which, his tackle was frequently broken and injured, and that he consequently lightered the vessels to get them to his elevator so as to discharge them; that the cost of lightering was from 1 1-4 to 1 1-2 cents per bushel; that in consequence of the shoaling, he was compelled to employ a smaller class of vessels to bring his grain, which increased the rate of freight he was compelled to pay; and that the time occupied in unloading vessels by lighter- ing was much longer than in unloading them by the elevator. He also offered to show how much he had been compelled to pay for lightering on account of the filling of his dock and the difficulty of getting vessels to the elevator as aforesaid, claiming that it constituted one element of damage, but the court excluded it.

Upon this evidence, which was substantially all that was intro- duced by him, the plaintiff rested his case. The defendants re- quested the court to take the case from the jury, contending that as matter of law the action could not be maintained. The court so ruled and directed a verdict for the defendants, and reported the case to this court, which was to set aside the verdict and grant a new trial if upon any aspect of the case or from any error in the rulings the plaintiff was entitled thereto; otherwise judgment was to be entered on the verdict for the defendants. Any amend- ment that might be required to enable the plaintiff to maintain his action for the injury complained of, or the defendants to intro- duce a defence, was to be allowed upon such terms as the court might direct.

*J. M. Morton, Jr.,* for the plaintiff.

*T. M. Stetson, (J. C. Blaisdell* with him,) for the defendants. Upon the point that the case was simply a case of the diversion of surface water from the streets, and that therefore no action would lie, were cited *Barry* v. *Lowell,* 8 Allen, 127; *Emery* v. *Lowell,* 104 Mass. 13; *Flagg* v. *Worcester,* 13 Gray, 601; *Turner* v. *Dartmouth,* 13 Allen, 291; *Wheeler* v. *Worcester,* 10 Allen, 591.

MORTON, J. As the presiding judge directed a verdict for the defendants, we must, for the purposes of this hearing, assume as

established all the facts in favor of the plaintiff which the jury would be warranted in finding upon the evidence.

There was evidence tending to show that the plaintiff is the owner of a wharf and adjoining land, situated upon a creek in which the tide ebbs and flows, and which is the outlet of a natural stream flowing from the Watuppa ponds to the sea; that before the commencement of this suit, the city of Fall River had constructed a system of drains or sewers by which the water over a large tract of land was collected into one channel and discharged into the head of the creek, and that the gravel, sand and sediment carried by the sewers had accumulated and partially filled up the creek in front of the plaintiff's wharf. It was for the jury to determine whether this created a nuisance. The question presented for our decision is whether, upon any facts which the jury might find upon the evidence, the plaintiff can maintain a private action for such nuisance.

The defendants contend that what the plaintiff calls sewers were mere street gutters, designed to provide for the surface water, and built as a part of the construction and repair. of the streets. It is well settled law in this state that a city or town is not liable to an action for an injury done to a landholder by diverting the surface water and causing it to flow upon his land, if this is done in constructing or repairing a highway. *Flagg* v. *Worcester*, 13 Gray, 601. *Turner* v. *Dartmouth*, 13 Allen, 291. But the acts of the defendants went much beyond the mere diversion of surface water as an incident of the repairs of the streets. They built an extensive and connected system of drains by which the water from a number of streets was collected into one current and discharged into a cesspool or into the creek at a point outside the limits of the streets. They thus drained into the creek a territory of sixty to seventy-five acres, of which only about fifteen to twenty acres naturally drained into it. If the design of the system was merely to provide for the surface water, we are of opinion that the case does not fall within the principle of *Flagg* v. *Worcester* and the other cases cited by the defendants. But there was evidence tending to show that these were more than street gutters. The records of the city government generally

describe them as "sewers," and show that a portion of them, at least, were laid out under the laws authorizing the mayor and aldermen to lay out and make main drains and common sewers, and to assess a portion of the expense upon such as enter their particular drains into them or otherwise receive benefit from them. By their nature and construction they are calculated to serve the purposes of common sewers. Although there was no direct evidence that any individuals had entered their drains into them, it was competent for the jury to find that they were a part of the system of common sewers maintained and owned by the city.

The defendants had the right to make these sewers or drains, and to discharge them into the sea. But this right is subject to some limitations. It does not include the right to create a nuisance, public or private. If the sewers or drains are so built or managed as to create a public nuisance, the defendants are indictable; if a private nuisance is created, they are answerable in damages to the person injured. *Haskell* v. *New Bedford*, 108 Mass. 208. *Emery* v. *Lowell*, 104 Mass. 13. *Child* v. *Boston*, 4 Allen, 41. *Richardson* v. *Boston*, 19 How. 263. *Gerrish* v. *Brown*, 51 Maine, 256. *Attorney General* v. *Birmingham*, 4 Kay & Johns. 528.

The remaining and perhaps most difficult question in this case is, whether the plaintiff has proved such an injury as entitles him to maintain a private action. There is no doubt as to the general rules of law upon this subject. An individual cannot maintain a private action for a public nuisance by reason of any injury which he suffers in common with the public. The only remedy is by indictment or other public prosecution. But if, by reason of a public nuisance, an individual sustains peculiar injury, differing in kind, and not merely in degree or extent, from that which the general public sustains from the same cause, he may recover damages in a private suit for such peculiar injury. The difficulty usually is in applying these rules, and determining what injuries are peculiar and different in kind from the common public injury. The authorities upon the subject are numerous, but we shall refer only to a few of the cases decided in this state, where the ten-

dency has been to restrict the right to bring a private suit within narrower limits than seem to have been adopted in some cf the English cases.

In *Blood* v. *Nashua & Lowell Railroad Co.* 2 Gray, 137, the nuisance was a bridge built across a stream in such a manner as to obstruct it, the plaintiff owning and carrying on a saw-mill above the bridge. It was held that the plaintiff could not recover for damages caused by the obstruction of the stream rendering it more difficult and expensive to float logs to his mill, that being an injury suffered by the plaintiff in common with the rest of the public, and differing only in degree and not in kind; but that he might recover for setting back the water on his mills, that being an inconvenience special and peculiar to himself.

In *Brightman* v. *Fairhaven*, 7 Gray, 271, the obstruction complained of was a bridge across a navigable stream. The plaintiff owned land above the bridge, purchased after the bridge was built, and claimed damages upon the ground that the obstruction prevented the use of his land as a spar yard, and interfered with his access thereto from the sea. But the court held that as the damages claimed were " such as might be sustained by the other owners of land on the stream by reason of its not being navigable, and tending only to show a general depreciation of the land occasioned by the obstructions in the river," he could not maintain a private action.

In *Willard* v. *Cambridge*, 3 Allen, 574, the alleged nuisance consisted in the removal of a bridge forming a part of a highway ; the plaintiff had a lumber, wood and coal wharf adjacent to the bridge, and alleged that he was injured in his business, that access to his wharf was destroyed, that his houses occupied by tenants were rendered less desirable, and that he was obliged to abate from his rents in order to keep his tenants. But the court held that these damages were of the same kind as those caused to all persons who had occasion to use, and who owned property on, the highway leading to the bridge, and were not special or peculiar to the plaintiff so as to furnish a good cause of action.

In *Fall River Iron Works Co.* v. *Old Colony & Fall River Railroad Co.* 5 Allen, 221, it was held that if the public nuisance

complained of merely caused an obstruction to navigation, the plaintiffs had no private remedy, though the injury sustained by them was, by reason of their proximity to the nuisance, much greater in degree than that sustained by others.

The case of *Harvard College* v. *Stearns*, 15 Gray, 1, at first view, seems opposed to the plaintiff's right to maintain this action. There the nuisance consisted in filling up a navigable creek so as to cut off the plaintiffs' access to their land bordering on the creek, and it was held that the action could not be maintained. But it will be seen that the only damage claimed by the plaintiffs was for the diminished value of their land by reason of the obstruction of the creek, and the court decide the case upon the narrow ground that the action would not lie solely for this injury. In the opinion the court say : " No evidence appears to have been offered, or any claim set up or instructions asked of the court upon the ground of any particular actual hindrance or delay to the plaintiffs, or obstruction in reference to any case of actual intended use of their land by passing through the creek. The claim was for injury to their land by reason of an obstruction placed in a navigable stream or public way, whereby their land would be rendered more difficult of access and less valuable."

The case at bar would have been like that, if the plaintiff had merely proved that the defendants had obstructed the creek, and that such obstruction had diminished the value of his wharf by making the access to it more difficult.

It follows from the authorities we have cited that the plaintiff cannot maintain a private action for any loss or injury to him arising merely from an obstruction to navigation caused by the defendants. If, for instance, the effect of the defendants' acts had been merely to create a bar across the mouth of the creek, so as to destroy or injure its navigability, the plaintiff could not maintain an action because it was thereby rendered more difficult and expensive to reach his wharf, or because his wharf was rendered less valuable. Those would be injuries of the same kind sustained by all other persons who have occasion to use the creek, or who owned land bordering upon it. But in this case the evi-

dence tended to show that the effect of the sewers had been to fill up the creek directly in front of and adjoining the plaintiff's wharf, so that his vessels which he was accustomed to employ to bring grain to his wharf and elevator could not lie at the wharf on account of the diminished depth of water. We are of opinion that this was an injury, special and peculiar to him, for which he may maintain this action. He has a right to the water at his wharf at its natural depth. By the filling up of the creek, his use of his wharf for the purposes for which it had been constructed and actually used, was impaired, and he was subject to an inconvenience and injury which was not common to the public. Suppose a person had tipped stones off his wharf, forming a pile which prevented any profitable use of it. It would be an obstruction to the navigation of the creek, and to that extent the injury would be a common one to all the public, but the plaintiff would suffer an injury, in the hindrance of the use of his property, to which no one else would be exposed.

In *Blood* v. *Nashua & Lowell Railroad Co.*, *ubi supra*, the plaintiff recovered damages because an obstruction in the stream caused the water to flow back upon his mills.

In *Haskell* v. *New Bedford*, *ubi supra*, the plaintiff was held entitled to recover, among other elements of damage, for injuries of the same character as those complained of in this case. See also *Stetson* v. *Faxon*, 19 Pick. 147; *Brewer* v. *Boston*, *Clinton & Fitchburg Railroad Co.*, *ante*, 52.

Upon the whole case we are of opinion that there was evidence which should have been submitted to the jury, tending to show that the defendants illegally created a nuisance by filling up the creek, and that the plaintiff suffered thereby an injury special and peculiar to himself, for which he is entitled to recover in this action. *Verdict set aside.*