(Decided 3rd June, 1875.)

THE MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* SAMUEL APPOLD.

*Rights of Riparian Proprietors—Case of the introduction of an Artificial supply of Water into a stream running through the land of another—Jurisdiction in Equity—Injunction.*

The right of every riparian owner to the enjoyment of a stream of running water in its natural state, in flow, quantity and quality, is incident and appurtenant to the ownership of the land itself, and being a *common right*, it follows that every proprietor is bound so to use the common right, as not to interfere with an equally beneficial enjoyment of it by others.

As such owner he has the right to insist that the stream shall continue to run, as it was accustomed to run, that it shall continue to flow through his land in its usual quantity, at its natural place, and at its usual height.

Mayor, &c., of Balt. *vs.* Appold.

But there must be allowed to all a *reasonable use* of that which is common; and such a use, although it may to some extent diminish the quantity, or affect in a measure the flow of the stream, is perfectly consistent with the common right.

It is impossible to lay down a precise rule defining the limits which separate the lawful from the unlawful use of a stream, to cover all cases; and the question must be determined in each case by taking into consideration the size of the stream, the velocity of the current, the nature of the banks, the character of the soil, and a variety of other facts; the true test being whether the use is of such a character as to affect materially the equally beneficial use of the stream by others.

An attempt to empty into a stream an artificial supply of water to the extent of 10,000,000 gallons in every twenty-four hours, is a user inconsistent with the common enjoyment of the stream by all other riparian owners.

And being an unreasonable and unauthorized use of the stream an action will lie by the party whose rights are so invaded, even though he may not have suffered any actual damage.

The jurisdiction of Courts of Equity in cases affecting the rights of riparian owners, is well established both in this Country and in England; and rests upon the necessity of granting relief to prevent permanent and lasting injury, or where full and adequate relief cannot be had at law, or where it is necessary to prevent a multiplicity of suits, and vexatious litigation.

The complainant's bill for an injunction to prevent the introduction of an artificial supply of water into a stream flowing through his land, alleged, that he was credibly informed and verily believed that the introduction of the proposed additional quantity of water would cause the stream to overflow its banks, render valueless his land, and cause great, continual and irreparable damages, &c.; HELD:

1st. That the averment that "he was credibly informed and verily believed," together with the statement of facts upon which his belief was founded, was sufficient.

2nd. That he was not obliged to wait until actual damage was sustained, nor was he bound to obtain the opinion of scientific persons as to the probable consequences resulting from this artificial addition of water.

3rd. That it would not be enough that the injunction should merely enjoin the introduction of the proposed additional supply of water in such a way, or to such an extent, as would cause the stream to overflow its banks, or would interfere with the ordinary use of the stream by the complainant.

APPEAL from the Circuit Court for Baltimore County, sitting in Equity.

The bill of complaint in this case filed by the appellee, alleges:

"1st. That he is the owner in fee-simple, and for several years last past has been such owner of a tract of land situated in Baltimore County, in the State of Maryland, through which runs a stream of water called and known as 'Roland's Run,' and he herewith files, as Exhibit No. 1, a true copy of the deed under which he holds said land.

"2nd. That said stream is a stream of considerable body, and flows in a regular course, and has so done for a time whereof the memory of man runneth not to the contrary, and is of great value to the land of your orator, through which it runs, and which binds upon it on both sides, as well for domestic as agricultural and manufacturing purposes; and the land of your orator on both sides of said stream, is nearly, if not all, of a flat and level nature, and the banks of said stream are not more than sufficient to contain within them the waters of said stream, as they naturally flow during certain portions of the year.

"3rd. That the Mayor and City Council of Baltimore, acting under the powers vested in the said city by the laws of the State of Maryland, for the purpose of conveying water into the said City of Baltimore, being the Act of 1853, ch. 376, the Act of 1868, ch. 467, the Act of 1862, ch. 240, have recently determined to conduct a portion of the waters of the Gunpowder River, a stream running through said Baltimore County, from said river, into Lake Roland, in said county, from which latter lake the reservoirs which supply the City of Baltimore with water are supplied; that accordingly, in order so to conduct the waters of said river into said lake for said purpose, the City of Baltimore proceeded to acquire, by purchase or condemnation, from the several owners thereof,

the right of way or easement for conducting said water from the bank of the Gunpowder River, to and through the land of one Temperance Ellen Talbott, whose land binds on said 'Roland's Run,' above mentioned, a short distance above that of your orator; there being a number of distinct pieces or portions of land, in distinct and separate ownership, so lying on the route of said water-works or way, in the distance from the banks of said Gunpowder River to the said land of said T. Ellen Talbott; that having so acquired by purchase or condemnation the said rights of way or easement, paying for each of the same large sums of money, the said Mayor and City Council of Baltimore have laid through the said lands, intervening between the said Gunpowder River and the land of said T. Ellen Talbott, large iron pipes, designed to, and having the capacity to convey at least ten millions of gallons of water in every twenty-four hours, and have also erected at the said Gunpowder River, large and powerful engines and machinery, designed and able to force said quantity of water at least, if not more, through said pipes. That the object, plan, design and purpose of the said Mayor and City Council of Baltimore, in constructing said engines, machinery and pipes, is to convey as aforesaid at least 10,000,000 gallons of water in every twenty-four hours from the Gunpowder River into Lake Roland. And your orator avers and charges, that said works have been constructed since the passage of, and in execution and pursuance and to carry out the purposes of the Ordinance of the Mayor and City Council of Baltimore, approved Dec. 23rd, 1872, being Number 3 of the Ordinances of said city, of 1873, which your orator prays may be taken as a part of this, his bill of complaint, the same being herewith filed as Complainant's Exhibit No. 2; and he also prays that all other exhibits herewith filed, or hereafter to be filed, may be taken as part of this bill.

" That said Mayor and City Council of Baltimore having thus acquired the right of way for, and laid, the said

pipes through the lands intervening between the said Gunpowder river and the lands of said T. Ellen Talbott, design and purpose to stop and have so constructed as to stop said pipe line at this point, and to allow and cause the volume of water so to be brought through said pipes to flow out of the mouth of the same on to the said land of T. Ellen Talbott, at a point on the said 'Roland's Run,' as it passes through the said land, and thence to flow into 'Roland's Run' at said point, with the design and expectation that said water so coming from said pipes will flow along the bed of said 'Roland's Run' and mingling with its waters through the said land of T. Ellen Talbott, and from it on to the land of the next adjoining proprietor below her, and from said land on, to, through and over the land of your orator, (he owning the land separated from that of said T. Ellen Talbott by only one proprietor,) and from thence through and over the land of other owners into the aforesaid 'Lake Roland.'

"That the land of your orator lies between the land of the said T. Ellen Talbott and the said Lake Roland, and lies on a lower grade than the land of said T. Ellen Talbott, and said Roland's Run flows from said land of said Talbott towards and across your orator's land in its course to said Lake Roland, and the water which will come out of said pipes on to said land of said Talbott, must and will of necessity flow from said land on to your orator's land, and is so designed to flow according to the plan and purpose of the said works constructed by the said Mayor and City Council of Baltimore, for the purpose of conducting the water of Gunpowder River into said Lake Roland.

"That said Mayor and City Council of Baltimore have also acquired by condemnation the right to bring said water so coming and to come through said pipes on to said land of said T. Ellen Talbott, and to flow the same through and over the said land in its course towards the said Lake Roland, and have paid to her for said right a considerable

sum of money, to wit, the sum of four thousand dollars, and paid to the owners of the estate known as 'Hampton,' the sum of thirty thousand dollars for the simple privilege of laying the said pipes through their land, as well as considerable sums of money to other persons on the line taken by said pipe.

" That said rights having now been acquired from the said T. Ellen Talbott, and said pipes having been laid, and being now ready for use all the way from the Gunpowder River to her land, and the requisite engines and machinery having been constructed, and being now ready for use, the Mayor and City Council are about at once to force the said Water of the Gunpowder River through said pipes on to the land of said Talbott, and from thence to conduct and cause it to flow in quantities of at least 10,000,000 of gallons in every twenty-four hours, on to and over the land of your orator, in its course to the same lake or body of water, which in the legislation of the State relating to the water-works of the City of Baltimore, is called 'Swann Lake.' Which said water so to be conducted into said Lake Roland is to form a part thereof. That said Mayor and City Council of Baltimore have taken no steps to acquire, and have not acquired from your orator, or from any previous owner of his land, any easement, right or title in said land, for the purpose of conducting said water over the same, or any other right or title in said land whatsoever, but intend and are about at once, and have declared that they intend to bring said large volume of water on to, and carry the same over the land of your orator, without acquiring any right or easement in said land for this purpose, or paying to your orator any compensation for the burden they thus propose to cast upon said land, and the right, or wrongs rather, they thus propose to exercise over his said land, giving as their excuse for this unlawful proceeding, that they expect said water to flow with and along the stream called

'Roland's Run,' which now runs through your orator's land as above mentioned.

"And your orator further charges that none of the water which is so to be brought through said pipes, and caused to flow by the aforesaid artificial means on to the land of your orator, would otherwise come on to your orator's land, and none of the water from the said Gunpowder River can or would flow according to natural laws on to the land of your orator, said Gunpowder being distant at least three and one-half miles from said land of your orator, and its waters flowing away from and not towards his land, and said water so about to be brought in said pipes has to be forced through them, such is the grade of the intervening distance for a large part of the way by engines having a capacity of some seven hundred horse power.

"And your orator further charges, that said Mayor and City Council have no right to bring said water thus about to be brought from said Gunpowder River, by said artificial means on to the land of your orator, unless they first acquire by purchase or condemnation the right to do so, even if it were true that said water when so brought, would necessarily run with, and be confined within the banks of the said 'Roland's Run,' as it flows through your orator's land, and your orator in this connection charges that he is credibly informed, believes and so charges that the banks of said stream have not capacity enough to carry the waters that by natural causes flow and drain it, together with the said additional quantity of 10,000,000 gallons in every twenty-four hours so proposed to be brought on said land, and that therefore said artificial addition to said stream will cause said stream to overflow its banks and cause great, continued and irremediable and irreparable damage to the land of your orator, and in addition to this source of damages, said artificial source of supply when so introduced into said stream, will so fill its

banks, as will prevent your orator from constructing proper drains and water courses on his said land for the draining of the same, and so may render much of it valueless.

"And your orator further charges, that much of your orator's land lying about on a level with said stream called 'Roland's Run,' as it is by nature, it is not at all certain (independent of the above mentioned want of capacity of its banks to carry said stream when swollen by said artificial supply,) that said artificial stream of water so coming from said pipes, will follow or flow into said stream, but may run at large over your orator's land, adjacent to said stream, especially in view of the fact which your orator charges to be true, that said Mayor and City Council of Baltimore, have not acquired and do not propose to acquire any right or easement in the tracts of land lying between the land of your orator and that of the said Talbott, and will therefore have no power or right to enter thereupon to give direction or course to said artificial stream of water, on, to or over the land of your orator.

"And your orator therefore charges, that the introduction of said artificially brought flow of water on to the land of your orator, will, if the consequence be as above pointed out, (and which your orator has reasonable cause to apprehend and believe, and does apprehend and believe will result,) cause the destruction of all useful enjoyment of much of his land, and cause to him in this regard irreparable damage.

"And your orator further charges, that he has no adequate remedy at law in the premises; and that if he allows said Mayor and City Council of Baltimore to bring said water on to his land, and continue the use of the same for this purpose for twenty years, then the Mayor and City Council would by his acquiescence acquire an indefeasible right to continue said flow, and your orator could have no remedy at law, except by an action for trespass, which would result in a multiplicity of suits, as he would have a

right to bring an action for each day said water was allowed to be on his land; but your orator is independently entitled to enjoy his land and all its rights, free from the infliction of the burden about to be placed on it by the Mayor and City Council of Baltimore, which is a municipal corporation, and about to occupy and exercise acts of ownership on your orator's land, acting under pretended powers granted to it by the Legislature of Maryland, when no such powers have been conferred upon it, and it is thus attempting in the face of the constitutional inhibitions on the subject, to acquire rights in your orator's land for its own purposes, without making compensation therefor, and this Court has ample jurisdiction on this ground, to restrain the said corporation in the said unlawful attempt."

The bill prayed an injunction against the defendant, "restraining, enjoining and prohibiting it, its servants, officers and agents, from bringing or carrying, or allowing to flow on to the land of your orator, described in his said deed filed with this, his said bill of complaint, or in the aforesaid stream called 'Roland's Run,' as it flows through said land, any water brought by said Mayor and City Council of Baltimore through the pipes laid by it from the Gunpowder River as aforesaid, until the further order of this Court," &c.

On the filing of the bill, an order was passed by the Court below (YELLOTT and WATTERS, J.,) directing the injunction to issue as prayed. From this order the defendant appealed.

The cause was argued before BARTOL, C. J., GRASON, MILLER, ALVEY and ROBINSON, J.

*I. Nevett Steele,* for the appellant.

Such a use, as is set forth, of said stream, by a lower proprietor, would not be a "taking." The rule laid down

by Cooley, is that "any injury to the property of an individual, which deprives the owner of the ordinary use of it, is equivalent to a taking, and entitles him to compensation." And likewise the diversion of a stream, "so that those entitled to its benefits are prevented from making use of it as before," would be a taking. *Cooley's Constitutional Limitations*, 544; *Ib.*, 557; *Balto. & Pot. R. R. vs. Magruder*, 34 *Md.*, 79.

But here is no deprivation of the "ordinary use" of the stream, nor would the appellee "be prevented from making use of it as before." *Plumley vs. G. B. Co.*, 13 *Wall.*, 181; *Canal Appraisers vs. The People*, 17 *Wend.*, 571; *Cott vs. Lewistown R. R.*, 39 *N. Y.*, 214; *Gardner vs. Newburgh*, 2 *John. Ch.*, 162; *Hooker vs. N. H. & M. Co.*, 14 *Conn.*, 146.

If the allegations were otherwise sufficient, the Court would not interpose its extraordinary power of injunction to stay a great public work, which involves the "safety and sanitary condition of the city," upon a charge based only on information.

The bill and ordinance taken together, refute completely the allegation of damage, and show on the contrary, that such a use of the stream, as is proposed, would be a positive benefit to the appellee.

If the appellee in all respects had made out a case which would entitle him to relief, he would not be entitled to such relief as is prayed, and such an injunction as was granted. The injunction, in any event, should not restrain the appellant from thus introducing *any* water, and should not go further than to enjoin such introduction in such way, or to such extent, as would overflow the land of the appellee, or interfere with his ordinary use of the stream.

*Bernard Carter* and *Arthur W. Machen*, for the appellee.

While each riparian proprietor on the banks of a stream has the right to utilize its waters, as they naturally flow,

for his own purposes, and for this purpose may constru ct dams, sluices, drains, &c., on his own land, and cause the water thus naturally flowing in the stream to pass on, to and over the land of his neighbor below, yet he cannot increase the quantity or accelerate its flow to his neighbor's damage. This is the law as to water which flows by natural causes from his land. *Kerr on Injunctions*, 379, *ch. 18, sec. 4, clause 5* ; *Kerr on Injunctions*, 390, *par.* 28. But as to waters artificially brought on to his land, he has no right to cause *these* to flow on to his neighbor's land *at all*, without his consent. *Kerr on Injunctions*, 386, *par.* 21 ; *Rylands vs. Fletcher*, 3 *Irish & Eng. Appeals*, 330, (*Law Rep.;*) *Baird, et al. vs. Williamson, et al.*, 109 *Eng. Com. Law*, 376 ; *Gale on Easements*, 378 ; *Rockdale Canal Co. vs. King*, 2 *Simons' New Rep.*, 78 ; *Webb vs. The Portland Manf. Co.*, 3 *Sumner*, 190 ; *Dickinson vs. The Grand Junction Canal Co.*, 15 *Beav.*, 260.

Nor is it necessary to show that damage will result, in order to sustain a bill for an injunction. The *possibility* of such damage is sufficient; and the Court will not speculate as to the consequence of the act ; its unlawfulness is sufficient ground. *Crossley vs. Lightowler*, 2 *Chancery Appeals*, 478, (*Law Rep.;*) *Bicket vs. Morris*, 1 *Scotch & Divorce Appeals*, 49, (*Law Rep.;*) *Same case*, 14 *Law T. Rep., N. S.*, 838 ; *Kerr on Injunctions*, 378.

The city has no more right to bring a great body of water on to the land of the appellee, without first acquiring a right by purchase or compensation, than it has to bring a large quantity of earth in the shape of a railroad embankment, and this being so, the jurisdiction of a Court of Equity is clear. *Western Md. R. R. vs. Owings*, 15 *Md.*, 199 ; *Mayor, &c. vs. Groshon*, 30 *Md.*, 436 ; *Harness vs. Ches. & O. Canal Co.*, 1 *Md. Ch. Dec.*, 248.

The jurisdiction exists only upon the ground that to sue at law would involve a multiplicity of suits. *Holland vs. Mayor, &c., of Balt.*, 11 *Md.*, 197.

If compelled to seek our remedy at law, we should have a right to bring, and would be compelled for all practical purposes, to bring suits every time the land overflowed.

Even supposing it were not alleged that damage would certainly ensue, yet, if it *may* ensue, the remedy by injunction to restrain the wrongful throwing of this water on the land of the appellee, exists and must exist, for the following reasons: If it should be held that no remedy exists until actual damage occurs, then the water might flow for twenty years and no damage occur in the twenty years, and yet, in the twenty-first year great damage might occur. Now in this state of the case all right to interfere would be gone, because though the original flowage of the water was unlawful, yet, by the appellee's allowing the flowage to continue for twenty years, the right would be acquired by the city. *Kerr on Injunctions*, 390, *par.* 28, *and* 387, *par.* 21.

The consequences of the flowage are alleged in the bill, to be that the banks will not contain the extra quantity of water, and hence that the land outside of the stream will be overflown. This clearly makes a case of an attempted user of the land of the appellee for the purposes of the appellant, and is taking private property without making compensation.

But independently of the illegal acts of the city in attempting to use the appellee's land without compensation, and the damage which will be caused by its overflow, and destruction of its drainage as charged in the bill, it is to be remembered that under the legislation of the State, the appellant would be inhibited from using for purposes now perfectly lawful, the waters of Roland Run. See *Act of* 1862, *ch.* 240, *sec.* 14.

Thus the rights of the appellee in the water already naturally in said stream, would be entirely changed, as it would be unlawful to use for the purposes named in said law, the waters brought from the pipes, and that being

mingled with the natural flow, none could be used for the prohibited purposes. The city has ample power to condemn "Roland's Run," and has no right to use it otherwise. See 2 *Code, Art. 4, sec. 930.*

The appellee, as proprietor of the land on both sides of the stream, "Roland's Run," is proprietor of the bed of said stream, as much as of any other part of his tract of land, and can exercise over this all proprietary rights, as much as over any other part of his land, subject only to his obligation, to allow the water that by nature flows in said stream, to leave his land at the place marked out by nature, uncorrupted in quality, and undiminished and unincreased in quantity. And that as a resultant of this proprietary right over the land covered by the bed of the stream, he has a right to change the course of the stream, in whole or in part, as it flows through his land, provided it is brought back, when leaving his land, to the same point at which it formerly left it, and that the change does not accelerate or diminish the flow. 3 *Kent's Com.,* 439 to 441, *(marg.;) Stein vs. Bouden,* 29 *Alabama,* 127 ; *Washburn on Easements,* 334, *(marg.* 266,) 397, *(marg.* 306,) 388, *(marg.* 315.)

This principle being well established, it results, that the artificial flow brought by the appellant, creates a new easement in the land of the appellee, and constitutes such a substantial exercise of right in his land, and such an interference with his proprietary right, as amounts to a taking of private property without compensation. The burden of making, in case of such diversion, a channel for the new supply, is clearly the imposition of a duty which can only be imposed in consideration of compensation.

The bringing of a new supply of water on land, is an *actionable* wrong, even though it does not *overflow* the banks of the stream. *Wright vs. Moore,* 38 *Alabama,* 594, 596.

The banks of the stream, where one owns land on both sides, being the property of the land owner, the flowage of

the new supply against the *sides* of these banks, is as much an exercise of easement in land, and so an *invasion* of private property, as if the water was made to flow *over* and *upon* land which was not before flowed, and did not form the bed of a stream.

It is conceded by the appellants, that if this ten millions of gallons were caused to flow *outside* of the bed of the stream, it would be an invasion of the rights of private property, which could not be made without compensation. Now the flowage, of ten million gallons, even if it could be contained within the banks, must flow against the sides of the banks, which would not be pressed against by the quantity of water which naturally flows in the stream. This user of the SIDES of the banks therefore, for an artificial supply of water, is as much a user of the appellee's land as if it flowed on *top* of the land outside of the banks of the stream. There is no difference in kind or principle in the two cases; neither right can be exercised without making compensation. It is the duty of a Court of Chancery to enjoin a corporation from doing such an injury, though it is only a trespass. *High on Injunctions, sec.* 764.

ROBINSON, J., delivered the opinion of the Court.

At the time of the application for the writ of injunction in this case, the appellant had nearly completed the works necessary for the introduction of an additional supply of water into its corporate limits, to be used as the exigencies of the season might require.

The plan was to bring the water from Gunpowder River through pipes to a point on "Roland's Run," at which point, it was to empty into the stream, and thence flow with the stream to Lake Roland, the main water reservoir of the appellant.

The water was to be forced into the pipes by engines capable of furnishing a supply of ten millions of gallons in every twenty-four hours.

The appellee alleges, that he is the owner of the land on both sides of "Roland's Run," below the point at which this additional supply of water was to empty into the stream—that the banks of the stream are not more than sufficient to contain within them the waters of said stream, as they flow at certain portions of the year—that the introduction of this additional quantity of water will cause the stream to overflow its banks, prevent the drainage of the adjacent land, render it valueless, and cause great, continued and irreparable damage to the same.

The first question to be determined is, whether the appellant is entitled to the use of the stream for the introduction of this additional supply of water? and secondly, if not, whether the appellee is entitled to the writ of injunction as prayed?

The right of every riparian owner to the enjoyment of a stream of running water in its natural state, in flow, quantity and quality, is too well established to require the citation of authorities. It is a right incident and appurtenant to the ownership of the land itself, and being a *common right*, it follows that every proprietor is bound so to use *the common right* as not to interfere with an *equally beneficial enjoyment of it by others*. This is the necessary result of the equality of right among all the proprietors of that which is common to all. As such owner, he has the right to insist that the stream shall continue to run *uti currere solebat*, that it shall continue to flow through his land in its usual quantity, at its natural place and at its usual height. Without a grant either express or implied, no proprietor has the right to obstruct, diminish or accelerate the impelling force of a stream of running water. Of course we are not to be understood as meaning there can be no diminution or increase of the flow whatever, for that would be to deny any valuable use of it. There may be, and there must be allowed to all of that which is common, *a reasonable use*, and such a use, although it may, to some

extent, diminish the quantity, or affect, in a measure, the flow of the stream, is perfectly consistent with the common right.

The limits which separate the *lawful* from the *unlawful use* of a stream, it may be difficult to define. It is, in fact, impossible to lay down a precise rule to cover all cases, and the question must be determined in each case, taking into consideration the size of the stream, the velocity of the current, the nature of the banks, the character of the soil and a variety of other facts. It is entirely a *question of degree*, the true test being whether the use is of such a character as to affect materially the equally beneficial use of the stream by others.

In this case, the appellant proposes to empty into " Roland's Run" an artificial stream of water, to the extent of ten millions of gallons in every twenty-four hours. It can hardly be contended that such a user is consistent with the common enjoyment of the stream by all other riparian owners. If the appellant has the right to empty an artificial stream of water into "Roland's Run," every other riparian owner would be entitled to the same right, and the necessary consequence would be, not only to affect the quantity and increase the natural current of the stream, but in fact to change the character and nature of the stream itself. Such a use cannot be said to be incident to the *reasonable user* of a stream; on the contrary, it goes beyond the natural right to which the appellant, in common with all other proprietors, is entitled, and being an unreasonable and unauthorized use of the stream—an invasion, in fact, of the rights of the appellee—an action would lie, even though he might not have suffered any actual damage. It is well settled that every injury to the rights of another imports damage, and if no other damage is established, the party injured is at least entitled to a verdict for nominal damages. Especially is this the case where the invasion of a right may become the foundation of an adverse claim, and thereby operate as an extinguishment of the right itself.

Assuming then, that the use of the stream in the manner proposed by the appellant, to be in violation of the rights of the appellee, the question is, whether he is entitled, under the circumstances of this case, to a writ of injunction.  The jurisdiction of Courts of Equity in cases affecting the rights of riparian owners, is well established, both in this country and in England, and rests upon the necessity of granting relief to prevent permanent and lasting injury ; or where full and adequate relief cannot be had at law, or where it is necessary to prevent a multiplicity of suits, and vexatious litigation.

Here the complainant alleges that he is credibly informed and believes that the introduction of the proposed additional quantity of water will cause the stream *to overflow its banks, render valueless his land, and cause great, continued and irreparable damage, &c.*

The averment that he is credibly informed and believes, together with the statement of facts upon which his belief is founded, are, in our opinion, sufficient.  He was not obliged to wait until actual damage was sustained, nor was he bound to obtain the opinions of scientific persons as to the probable consequences resulting from this artificial addition of water.   In *Bicket vs. Morris,* 14 *Law Times Reports, N. S.,* 838, Lord CRANWORTH said :

"The owners of the land on the banks are not bound to obtain or to be guided by the opinions of engineers or other scientific persons as to what is likely to be the consequence of any obstruction set up in waters in which they all have a common interest.   They are allowed to say we have all a common interest in the unrestricted flow of the water, and we forbid any interference with it."

Taking then, the allegations in the bill to be true, which we are obliged to do in this appeal, we think the appellee is entitled to the equitable interposition of the Court.   It was suggested, however, that in any event, the injunction ought not to go further than to enjoin the introduction of

the proposed additional supply of water in such a way, or to such an extent as would cause the stream to overflow its banks, or would interfere with the ordinary use of the stream by the appellee. But the answer to this is, that the use of the stream by the appellant for the purpose of introducing within its corporate limits an additional artificial supply of water, being an unauthorized use and an invasion of the rights of the appellee, as riparian owner, an action would lie, even though no actual damage be sustained. The daily use of the stream, therefore, even for such a purpose, would lead to a multiplicity of suits, and to vexatious and oppressive litigation. Moreover, an injunction thus modified, might deprive the appellant of a supply of water absolutely necessary in the emergencies of a drought, and thus defeat the purpose for which the works in question were constructed. So looking to the case as it is presented by this record, we feel constrained to affirm the order granting the writ of injunction. The appellant can of course acquire the right to use the stream in the manner proposed, by condemnation, and a jury can determine, with the evidence before them, what damage, if any, is likely to be sustained, and what compensation the appellee ought to receive. For these reasons the order below, granting an injunction, will be affirmed.

*Order affirmed.*

(Decided 3rd June, 1875.)