THE MAYOR AND CITY COUNCIL OF CUMBERLAND *vs.* ASABEL WILLISON.

*Liability of a Municipal Corporation for Consequential Damages to Private Property—Taking of Private Property for Public Use—A Municipal Corporation not responsible for an Unauthorized Act of the Mayor—Use of Water by Citizens under an Ordinance authorized by Act of Assembly.*

The authorities of the City of Cumberland, in the execution of the powers conferred on the corporation by Act of Assembly, for the paving, grading, repairing, draining, sewering and extending of the streets of the City, but with no want of reasonable care and skill in making the improvements, changed or so directed. the natural flow of surface water, which usually found its way into a mill-race in the city, that a larger flow of such water than formerly was emptied into the mill-race, along a given street, and in times of heavy rains, a larger quantity of mud, sand and debris, was thus carried into the race near the mill, than before such improvements were made. For the injuries caused by these obstructions to the free flow of water, the owner of the mill and its appurtenances brought suit against the City to recover damages. HELD:

That, as the defendant acted within the scope of the authority conferred on it by the laws of the State, and with no want of reasonable care and skill in the execution of the power, the action could not be maintained.

The negligent and careless performance of a lawful act, whereby injury results, gives rise to an action against a municipal corporation as well as against an individual.

Where real estate is actually invaded by superinduced additions of water, earth, sand or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking of private property within the meaning of the Constitutional prohibition.

Mayor and C. C. of Cumberland *vs.* Willison.

Where the mill-race of the plaintiff was filled by the washings from the street, by means of hose attached to fire plugs, done under the direction of the mayor of a municipal corporation, in an action for damages it was HELD:

That, as the act on the part of the mayor was unauthorized, the city was not responsible.

An Ordinance of a municipal corporation authorized by Act of Assembly, permitting the citizens to use the water of the city for household and domestic purposes, and also to sprinkle the pavements and streets in front of their houses, as is usually done in cities in warm and dry weather, would be a proper exercise of the power and for any injury resulting from such use of it, (if any could possibly so result,) the city would not be responsible.

APPEAL from the Circuit Court for Montgomery County.

The .conceded facts of this case (which was removed from the Circuit Court for Allegany County,) and the substance of the prayers offered by the plaintiff and defendant are stated in the opinion of the Court. The defendant excepted to the rulings of the Court below, (BOWIE, BOUIC and LYNCH, J.,) and the verdict and judgment being for the plaintiff, the defendant appealed.

The cause was argued before BARTOL, C. J., BRENT, MILLER and ALVEY, J.

*R. T. Semmes* and *H. W. Hoffman,* for the appellant.

A municipal corporation is not responsible in an action on the case for consequential injuries, arising from the proper and careful discharge of the duties imposed upon it by the Legislature.

To show that this is the law of almost every State in the United States, as well as in England, the appellant refers to 2 *Dillon on Corporations, secs.* 781, 783, 784 *and notes,* 797 *and* 798; *Collender vs. Marsh,* 1 *Pick.,* 418; *Radcliff's Executor vs. Mayor and City of Brooklyn,* 4 *Comst.,* 195; *Sprague vs. Worcester,* 13 *Gray,* 193; *Wheeler vs. Worcester,* 10 *Allen,* 591; *City of Delphi vs. Evans,* 36

*Ind.*, 90; *Munn vs. Pittsburg,* 40 *Penn.,* 364; 4 *Greene,* (*Iowa,*) 47; *Brine vs. Railway Co.,* 110 *Eng. Com. Law,* 402, 411; *Mersey Docks Cases,* 11 *House of Lords Cases,* 713, 714.

In all of these cases, the case of *Plate Glass Co. vs. Meredith,* 4 *Term R.* 749, quoted in 2 *Bingham,* 156, is recognized as authority, and we quote the language of Lord KENYON: "If this action could be maintained, every turnpike act, paving act, and irrigation act, would give rise to an infinity of actions. The parties are without remedy, provided the commissioners do not exceed their jurisdiction." This we contend is the law of Maryland, and we refer the Court to the case of *Barron, survivor of Craig vs. Baltimore,* see 7 *Peters,* 243.

This same question has also been adjudicated upon directly by the Supreme Court of the United States, in which it has declared the power over its streets by a corporation to be a continuing power. *Goszler vs. Georgetown,* 6 *Wheaton,* 593; *Smith vs. Washington,* 20 *Howard,* 135, 148; see also *Bowlsby vs. Spear,* 31 *N. J. Law,* 352.

It only remains then to look at the several Acts of the Legislature to ascertain the powers of the City of Cumberland over its streets and the health of its inhabitants, to see that under the principles of law applicable to such cases the Court erred in rejecting defendant's second prayer. (See *Acts of* 1815, *ch.* 136, *sec.* 6; 1844, *ch.* 320. *sec.* 2; 1864, *ch.* 121, *sec.* 6; 1874, *ch.* 100, *sec.* 47.)

In addition to the principle which we claim to be a valid defence in this case, to wit: the proper exercise of our corporate powers, we further contend that the testimony in this case shows at most, damage resulting from the control and direction of surface water, which is a common enemy, and for which we contend no case can be found to justify the ruling of the Court below. *Rawston vs. Taylor,* 11 *Exch.,* 369, 602.

If it were admitted in this case that the principle of prescription is applicable to the several rights involved, still

we contend that in order to enable the plaintiff to recover, it should have been a condition of the instructions to the jury, that they should find that the plaintiff had acquired an easement by prescription, as against the prior uses and corporate privileges of the City of Cumberland, as distinguished from an easement acquired over the lands of private individuals. We think that such a prayer ought not to be granted in this case, because the facts show that ever since 1815, Cumberland has used the natural stream as an outlet for the surface water, and drainage of the surrounding country; and that the plaintiff's easement was used by him in a manner subservient to the city, and not antagonistic, and without interruption for twenty years, or any other period. From his own testimony it appears that he has cleaned out the race twice in every year, with a full knowledge of and in obedience to the city Ordinance in that respect, which is contained in printed Ordinances No. 20, p. 73. From such a state of facts it results as a necessity that any injuries suffered by the plaintiff must be *damnum absque injuria* and he cannot recover. *Smith vs. Washington,* 20 *How.,* 135.

The principles which govern the acquisition of rights by prescription, it seems to us, are hardly applicable to the appellant in this case. This is not a question between the mill owner and riparian owners below him over whose lands he acquires a prescriptive right by twenty years' adversary use. The user even in such a case would of necessity be enjoyed only in the manner in which it had been enjoyed in the past, and that, by plaintiff's own admissions, involved the duty of cleaning out the tail race twice a year, in order to get the benefit of his uninterrupted flow of water. We think the Court erred in granting the first and third prayers of the plaintiff and in rejecting the second prayer of defendant; and particularly when we believe that in its decisions it has upset the whole current of decisions upon the question involved, as enunciated in

the Courts of the several States, as well as those of the United States, and particularly that of our own Court of Appeals, in *Barron, survivor of Craig vs. The Mayor, &c., of Baltimore City.*

The defendant's tenth prayer, was also improperly rejected. Under the Act of 1864, ch. 121, (Allegany County,) the defendant was invested with all the rights and powers necessary for the introduction of water into said city. And by sec. 19 of same Act: The Mayor and Councilmen of Cumberland are invested with the power and authority * * * * to regulate the introduction and *use* of said water. 32 *Vermont,* 367 ; 2 *Dillon on Corporations, sec.* 545.

*William M. Price,* for the appellee.

The complaint is based upon an excessive user by the city, causing the destruction of the race; in other words, an entire taking of the property of the individual for the public benefit, without a compensation ; a user beyond what it had acquired by long and continuous usage; and further, a granting of it to other private members of the corporation for their own private use, without just compensation to appellee.

Also the mere fact of turning the course of many of the gutters, &c., that carried the natural surface water into the race, at points where little or no injury was done, and emptying them in where they practically ruined the power, shows a degree of carelessness and negligence on its part that cannot be excused or palliated. The surface waters had accommodated themselves to the various drains, &c., and were emptied into the race at points where comparatively little or no harm had been done to the water power, but the appellant turns these several drains, and without showing any reason, other than perhaps to prevent the overflow of some other property holder, and at once empties them into the race immediately at the wheel, where the water is backed up and stops the power; this we say was criminal negligence on the appellant's part.

What has the city done here but take private property for public use?

In the first place, the appellee owns and keeps up the dam by which the flow of water is maintained in the race, otherwise there would be no water in the race eight months out of the year, and the city has conceded this by the payment of an annual sum ranging from $250 to $500 to the appellee, to assist him in cleaning thereout the filth deposited there by its sewers, &c.,

2nd. The appellee is the absolute owner of the easement, which is worth, and for which he paid $10,000.

3rd. The appellant has, by its ordinances and permits, taken absolute control both of the dam and race, and governs the amount of water to be let in, and when it shall flow and when not, (see Ordinance,) and directs how private sewers shall be made to empty in, &c.

4th. It has changed the course of the surface water leading into the city, in such a way, as to throw it all into the race, and make of it the main sewer to carry the public and private drainage of the city to the canal and river, and out of the town, virtually ruining the water power and depriving the appellee of $10,000 worth of property for the benefit of the citizens, and refusing to pay therefor, when, if the race had not been taken, the city would, have been compelled to build a sewer to carry off its filth and drainage; if that is not taking private property for public use, without compensation, then we do not understand the meaning of the terms; if it is as we understand it, then we want no other authority then the one cited by the appellant; we also cite *Eaton vs. The Railroad Co.,* 51 *N. H.,* 504, where the learned Judge discusses the question of what constitutes the taking of private property for public use. The doctrine announced in that case has received the sanction of the Supreme Court of the United States, in 13 *Wall.,* 168, 181, that Court held that "where

the real estate is actually invaded by superinduced additions of water, earth, sand, or other materials, or by having any artificial structure placed on it, so as effectually to destroy or impair its usefulness, it is a *taking* within the meaning of the Constitution." And Mr. Justice MILLER, who delivered the opinion of the Court, says, "this proposition is not in conflict with the weight of judicial authority in this country, and certainly not with sound principle." We confess we have not been able to see the difference between the property owned by the appellee and that set forth in the above opinion.

The creation of a sewer for city use, is a public thing, and therefore the property taken for that purpose is taken for a public purpose and must be paid for by the city.

The same principle is set out in all the authorities that we can find, and if the Legislature has delegated powers to the corporation by which it undertakes to appropriate the property of an individual for public purposes, without just compensation, then it has exceeded the constitutional limit, and its act is unconstitutional.

The second prayer of the appellee, that was granted, not only is embraced in the first, but goes to the extent of excessive user of the common right of using the race with the appellee, by appellant; that is a principle well known and has been decided in *Mayor, &c. of Balt. vs. Appold,* 42 *Md.,* 442, see *Wood on Nuisance, secs.* 706, 725, &c., and note; *Nevins vs. The City of Peoria,* 41 *Ill.,* 502; *City of Columbus vs. Woolen Mills Co.,* 33 *Ind.,* 485; *Stetson vs. Faxon,* 19 *Pick.,* 147; *Thayer vs. City of Boston,* 19 *Pick.,* 511.

MILLER, J., delivered the opinion of the Court.

The appellee, the owner of a water-mill and appurtenances situated in the City of Cumberland, brought this action against the city on the 19th of September, 1876, to

recover damages for injuries to his property, caused as the declaration alleges by the wrongful acts of the defendant. At the trial many points were decided in favor of the defendant, which are not brought up for review by this appeal. A brief statement of some of the conceded facts of the case, is essential to a clear understanding of the main question, which the appeal does require us to decide.

The water power of the plaintiff's mill is supplied mainly from Will's Creek. By a dam erected across that stream, and a short artificial cut through its left bank the water is turned and conducted into a natural channel or water course, and thence flows in this channel to the mill, and thence on and through the same channel to the Chesapeake and Ohio Canal. This natural channel which is called "Dry Run" is thus made to form the whole of the tail-race, and a greater portion of the head-race of the mill. It also receives the surface drainage from the eastern side of Will's Mountain beyond the city limits, and from all the hills and valleys on the north and east of the city, and is in fact the only natural outlet therefor. It passes through the city in a winding course for nearly a mile, and before the construction of the canal it extended to the Potomac River. When streets were first opened in that part of the city their drainage was discharged into this run or race. The mill in question was erected over and across this run in a central and built up part of the city, but at what time does not appear. It may be safely assumed however, that streets in that locality conducting drainage into the race, were opened and paved in whole or in part for a much longer period than twenty years before 1868. One of these was Bedford street, which was paved as early as 1845, and which emptied its drainage into the race a short distance below the mill. Bedford Road which is a continuation of this street beyond the city limits, passes along the side of a hill, and the surface water flowing down this hill formerly passed over this

road, and over adjacent vacant lots, now built upon, and
thence made its way through a hollow, and then down
Frederick street, reaching the race at a point more distant
from the mill, and nearer to the canal or river.   In 1868
an Act of the Legislature was passed authorizing an
extension of the city limits, under which the Bedford
Road for about four hundred yards was subsequently
graded and paved.   By this improvement the surface
water from the adjacent hill was intercepted and con-
ducted down Bedford street, whereby a larger flow than
formerly, of such water, was emptied into the race along
that street, and in times of heavy rains a larger quantity
of mud, sand, and debris was thus carried into the race
near to the mill, than before this improvement was made.
The growth of the city, the building of houses, and the
opening and extension of other streets, also contributed
to the same result.   The obstruction to the free flow of
water through the race resulting from these causes, is one
of the grounds of this action.   There is no evidence in
the cause of any want of reasonable care and skill on the
part of the city in making these improvements.

Upon this state of facts, the plaintiff asked two instruc-
tions to the jury, to the effect:   1st. That if they find
from the evidence that the water power of the plaintiff's
mill has been injured by obstructions to the free flow of
water through the race, caused by such acts of the defend-
ant as carried into the race an amount of rubbish and
debris, *at points and in quantities beyond* that which would
be so carried by the natural drainage of the city and the
adjacent country, then their verdict must be for the plain-
tiff, unless they find the defendant had a prescriptive
right to obstruct the flow of water in the tail-race of the
mill in the manner and *to the extent* of the obstructions
now complained of.   2nd. That if they find from the evi-
dence, that within twenty years prior to this suit the
defendant diverted the water, rubbish or debris, or any

considerable portion thereof from the regular and natural channel, by which it flowed down the hollow and Frederick street, and thence into the race near Liberty street arch, and carried the same down the Bedford Road and Bedford street, and emptied the same into the race at a point immediately below the mill, where it would more injuriously affect the free flow of water in the tail-race, whereby the plaintiff was damaged, then their verdict must be for the plaintiff, although they may find that the defendant had a prescriptive right to flow said water, rubbish and debris down the hollow and Frederick street, to the race at the Liberty street arch.  The defendant on the other hand asked an instruction, that if the jury shall believe from the evidence that the defendant in the proper execution of its powers under its charter for the paving, grading, repairing, draining, sewering and extending of the streets, lanes, and alleys of the city, so directed or changed the natural flow of the *surface water*, which usually found its way into the water course or mill-race mentioned in the declaration, whereby a *larger flow of such water* was emptied through or along Bedford street, than had formerly flowed through or along that line, and that from *this cause* injury resulted to the private property of the plaintiff, he cannot hold the defendant responsible for *that injury;* and that there is no evidence in the cause of any want of reasonable care and skill on the part of the defendant in the execution of said powers.  The Court granted the instructions asked by the plaintiff and rejected the one asked by the defendant, and it becomes our duty to determine whether there is error in this ruling.

How far municipal corporations are liable for consequential damages to private property resulting from the exercise of their corporate powers, or what will amount to the "taking of private property for public use" in the constitutional sense of these terms, has been the subject of much discussion and controversy.  Certain general principles

seem, however, to have been clearly settled by the current and weight of judicial authority. Thus it is well settled that such a corporation is not liable to an action for consequential damages to private property or persons (unless it be given by statute) where the act complained of was done by it or its officers under and pursuant to authority conferred by a valid Act of the Legislature, and there has been no want of reasonable care or skill in the execution of the power, although the same act, if done without legislative sanction, would be actionable. 2 *Dillon on Municipal Corp., sec.* 781. Upon this principle it has been decided by a great preponderance of authority that municipal corporations acting under authority conferred by the Legislature to make and repair, or to grade, level, and improve streets, if they exercise reasonable care and skill in the performance of the work resolved upon, are not answerable to the adjoining owner whose lands are not actually taken, for consequential damages to his premises, even though in grading and leveling the street a portion of the adjoining lot in consequence of the removal of its natural support falls into the highway, and the same immunity exists if the street be embanked or raised so as to cut off, or render difficult the access to the adjacent property, and this, too, although the grade of the street had been before established and the adjoining property owner had erected buildings or made improvements with reference to such grade. Property *thus injured* is not in the constitutional sense *taken* for public use. This doctrine was long since announced, after the most careful consideration, by Courts of the highest authority, and by Judges of great eminence and learning. *Collender vs. Marsh*, 1 *Pick.*, 418; *Radcliff's Executors vs. Brooklyn*, 4 *Coms.*, 195; *O'Connor vs. Pittsburg*, 18 *Penn. St.*, 187. It was also approved by the Supreme Court in the leading cases of *Goszler vs. Georgetown*, 6 *Wheat.*, 595, and *Smith vs. Washington*, 20 *How.*, 135. These authorities have been since followed and

adopted by the decisions of almost every State of the Union where the question has arisen, and in fact to such an extent that even the citation of the cases has become burdensome and superfluous. It is true that the Supreme Court of Ohio, in a series of decisions, has adopted a different doctrine and extended the liability of municipal corporations in such cases beyond the limits assigned to it elsewhere. By these decisions such corporations are held liable for consequential injuries which result from the exercise of their lawful powers upon the ground that if an act, though legal and lawfully executed, be done for the good of all to the injury of an individual, the injury should in justice and good morals be shared by all. But this doctrine has not only been rejected by the authorities to which we have referred but the Court which announced it admits it to be in direct conflict with the decisions both in England and America. *Crawford vs. Village of Delaware, 7 Ohio St.,* 459. So far, therefore, as injury to the private owner consists in leaving his property above or below the grade of a street, so as to cut off or render difficult the access thereto, and so far as its value or its convenient and comfortable enjoyment may be impaired in consequence of such grading or change thereof from time to time, the law seems to be well settled, and if the injury complained of in this case were of that character we should have no difficulty whatever in holding that the city was not responsible therefor.

But another species of injury may result to private property by the grading, paving, and improving of streets. By improvements made and work done upon streets, adjacent private property may be overflowed by water or injured by its action. In cases of this kind there is more difficulty, and perhaps more reasonable ground of conflict of authority. A distinction, however, has been taken, which may be well founded and reasonable between the disturbance or diversion of natural living streams, flow-

ing in channels within defined and actual banks, and *surface water* caused by rain or melting snow.   In the former case it has been held by some authorities that under the general power to grade and improve streets or to construct beneficial public improvements, a municipal corporation cannot deprive the owners of their property rights in the water course, or injure them by badly constructed and insufficient culverts or passage ways obstructing the free flow of the water, without being liable therefor.   But as respects *surface water* if the damage has resulted solely as a consequence of the proper execution of a legal power by the corporation, it falls within the general principle and there is no liability therefor, and hence it has been held that as the owner of property may take such measures as he deems expedient to keep surface water off from him or turn it away from his premises on to the street, so municipal authorities may exercise their powers in respect to the graduation, improvement and repair of streets without being liable for the consequential damages caused by surface water to adjacent property.   2 *Dillon, secs.* 797, 798.

In examining the numerous authorities upon this subject, we have found frequent reference to the opinion of Ch. J. ARCHER, in the case of *Barron vs. The Mayor and City Council of Baltimore,* reported in 2 *Amer. Jurist,* 203.   It has been very highly and deservedly commended, and it is strongly relied on in connection with the Ohio cases, by the Supreme Court of Illinois in the case of *Nevins vs. City of Peoria,* 41 *Ill.,* 502, (a case much pressed upon our attention by the appellee's counsel) as justifying an admitted departure from the current of decisions elsewhere. In the *Jurist* it is correctly reported as the opinion of the Judge sitting at *nisi prius* in Baltimore County Court, and in some of the references to it this fact is stated, but it is a little remarkable that we find no reference to the further fact that the rulings in the case in support of which this opinion was delivered, were, on appeal, *reversed*

by the Court of Appeals and a *procedendo refused*, though that fact is stated in the report of the case in 7 *Pet.*, 243, when it was taken up to the Supreme Court. We have examined the record of the case in this Court. The testimony in the bills of exception is quite voluminous, but the general features of the case are clearly enough stated in 7 *Pet.*, and they are substantially these: The plaintiff was owner of an extensive and highly productive wharf in the eastern section of Baltimore, enjoying at the time of his purchase of it the deepest water in the harbor; the city, in the exercise of its corporate powers over the harbor, the paving of streets, and regulating grades for paving, and over the health of the city, diverted from their accustomed and natural course certain streams of water which flow from the range of hills bordering the city, partly by adopting new grades of streets, partly by the necessary results of paving, and partly by mounds, embankments and other artificial means which were purposely adopted to bend the course of the water, to the wharf in question; these streams becoming very full and violent in rains, carried down with them from the hills and the soil over which they ran, large masses of sand and earth which they deposited along and widely in front of the plaintiff's wharf, and the consequence was that the water was rendered shallow and the wharf became of little or no value; this injury was inflicted under a series of ordinances between the years 1815 and 1821, was progressive, active and increasing at the institution of the suit in 1822; the plaintiff gave evidence tending to prove the original and natural course of the streams, the various works of the corporation from time to time to turn them in the direction of this wharf and the serious consequences of these measures to his property; the defendants did not assert that they ever made or proffered any compensation for this injury, but justified under the authority they derived from the charter of the city, granted by the

Legislature, and under several Acts of the Legislature conferring powers on the corporation in regard to the grading and paving of streets, the regulation of the harbor and its waters, and to the health of the city. Referring now to the record in this Court, we find that upon this state of facts the defendants asked two instructions:

1st. That in passing the several ordinances and resolutions offered in evidence by the plaintiff, the Mayor and City Council acted within the scope of the authority conferred on the corporation by the laws of the State, and therefore the plaintiff is not entitled to recover damages against the corporation in this action for the loss he may have sustained by the filling up of the water at his wharf, as stated in the testimony; *first*, because the corporation and its agents and servants, in making said alterations acted as public agents in discharge of a public duty imposed on them by law; *second*, because the corporation consists of the inhabitants of Baltimore City, and they are not liable for any injury done to the plaintiff by the acts of their servants and agents which were not commanded by the said corporation; *third*, because the river and the soil of the river being the property of the State, and the defendants being the agents of the State, clothed with discretionary powers with regard to the preservation of the navigation of the harbor, the defendants are not liable in this action for the consequences resulting from their acts as complained of in the declaration and stated in the evidence; and *fourth*, because if any wrong has been done in filling up the cove, it is a public nuisance and the plaintiff upon the evidence above stated has not sustained such an injury as will entitle him to maintain an action.

2nd. That in grading and paving the several streets, and damming and turning the water at the several places marked on the plat and stated in the evidence, the officers, servants and agents of the Mayor and City Council acted within the scope of their lawful authority, and if

the jury find from the evidence that they acted *bona fide* and to the best of their judgment, then the present action cannot be maintained against the corporation for any injury done by their said officers or agents in manner aforesaid.

But the Court (ARCHER, J.,) refused to grant these instructions, and was of opinion and instructed the jury that the plaintiff will be entitled to a verdict, if they believe from the testimony that the plaintiff's property was injured by the washings occasioned by the diversion of the waters flowing into the western cove and turning them into the eastern cove, and *only* to damages proceeding *from such a source,* as the counsel for the plaintiff have admitted, that they are not entitled to and do not claim damages on account of that portion of the injury, which may have been sustained by the washings from such of the waters as would naturally have flowed there, notwithstanding by the grading and cutting down of Washington and other streets, the waters which naturally flowed into the eastern cove carried down *more earth and sediment* than before said grading and cutting they had been accustomed to do. Then, after directing the jury as to the mode of ascertaining the damages, the Court further instructed them, that if they believe the plaintiff's property has been injured by the diversion of the waters from the western to the eastern cove, and that such diversion was neither malicious, negligent or careless, but was even beneficial to the general interests of the city, made with the best advice and with due circumspection, consulting the general prosperity of the city and its inhabitants, either for securing the health of the city or for preserving more effectually its navigation, still, notwithstanding, the jury should believe these facts, the plaintiff is entitled to damages for the injury they shall find he may have sustained, inasmuch as this general improvement would in such case be made for the benefit and advantage of the

inhabitants of Baltimore, and it would be *unjust* that the property of the plaintiff should be deteriorated and he (to the extent of such injury) be deprived of his property without remuneration. To these rulings the defendants excepted and this constitutes the first bill of exceptions. The same instructions of the Court were reiterated in the second exception, and the third and fourth need not be stated as they contain nothing material to the question before us. The defendants, after motion in arrest, appealed from the judgment against them. The well-known ability of counsel on both sides (Ch. J. TANEY then at the bar being the leading counsel for the city) warrants the inference that the cause was thoroughly argued in the Appellate Court. There was no formal opinion by the Court, but the following memorandum of their judgment in the case, written by Judge DORSEY, is filed among the opinions delivered at that term : " We concur with the County Court in overruling the motion to arrest the judgment for the reasons assigned, and also in their refusal of the appellants' prayers in their third and fourth bills of exception, *but dissent from the opinions of the Court below in the first and second bills of exception and therefore reverse their judgment. No procedendo to issue.*" We have stated this case thus at length from our own records not only because the judgment of the Court of Appeals therein does not appear in our State reports, but also to show that it is *that judgment,* and not the *overruled* opinion of Judge ARCHER, by which we must be guided in ascertaining what the law of Maryland on this question is. The absence of an opinion in so important a case stating the grounds of decision is of course to be regretted, but the record plainly shows that the doctrine subsequently followed and adopted by the Supreme Court of Ohio was clearly and forcibly presented by Judge ARCHER in his instructions to the jury, and that it was as clearly repudiated by the unanimous judgment of the Appellate Court. The refusal to grant a

*procedendo* shows beyond question the Court was of opinion that the plaintiff upon the facts contained in the record had no ground of action whatever. In all its circumstances it presents a much stronger case for sustaining the action than the one now before us. In fact the injury here complained of very closely resembles that for which the plaintiff's counsel in *Barron's Case* admitted they could sustain no action. That decision is decisive of the present case unless we now overrule it, and that we are not disposed to do, supported as it appears to us to be, by a great preponderance of authority elsewhere.

At this point we might well conclude our opinion upon this branch of the case, but deference to the able arguments of the appellee's counsel induces us to notice the most important cases upon which they have relied. As to those in Ohio we have already said all that is necessary. In *Nevins vs. City of Peoria,* the facts stated, in the Court's opinion, make a case in which the grading of a street for the purpose of improving its drainage, undertaken by the city, was *badly and carelessly done,* and never completed, in consequence whereof the plaintiff's house and grounds were flooded at every considerable rain with mud and water, and his property and business otherwise injured. Under that state of facts it seems to us the case might have been decided, and the opinion tested upon the well settled principle that the negligent and careless performance of a lawful act, whereby injury results gives rise to an action against a municipal corporation as well as against an individual. But Judge LAWRENCE, for whose learning and ability we have great respect, proceeds further in his opinion and adopts the opinion of Judge ARCHER and the Ohio decisions, and in this for the reasons already stated we cannot agree with him. The case of *City of Columbus vs. Woolen Mills Co.,* 33 *Ind.,* 435, was decided upon an Act of the Legislature, which provided that when the grade of a street has been once

established, it shall not be changed without first assessing
and tendering the damages occasioned by the change, and
this was held to apply to damages to property *outside* as
well as within the city limits.　In this there is no conflict
with the previous decisions in the same State, nor with
the subsequent case of *City of Delphi vs. Evans,* 36 *Ind.,*
90.　The cases of *Stetson vs. Faxon,* and *Thayer vs. City
of Boston,* 19 *Pick.,* 147 and 511, turn upon a different
point, and are instances of a different class of torts.　The
opinions in these cases contain no intimation of a purpose
to overrule the well considered judgment of Ch. J.
PARKER in the previous case of *Collender vs. Marsh.*　What-
ever conflict there may be between the Wisconsin cases of
*Alexander vs. Milwaukee,* 16 *Wis.,* 247, and *Pettigrew vs.
Evansville,* 25 *Wis.,* 223, or however difficult it may be
to reconcile them, it seems to us that the subsequent case
of *Hoyt vs. City of Hudson,* 27 *Wis.,* 656, has placed the
decisions of that State on this subject within the general
current of authority.　*Mayor &c. vs. Appold,* 42 *Md.,* 442,
was a case where the Legislature had granted power to
the City of Baltimore to acquire by purchase, or con-
demnation and payment of damages, the right *to use* any
land, water or water course it might deem expedient and
necessary for the introduction of water into the city.
After the main works had been constructed, the city by
ordinance adopted a plan for an additional temporary
supply, by bringing the water of the Gunpowder River
through pipes to a point on Roland Run, at which it was
to empty into that stream, to the extent of ten millions of
gallons per day, and thence flow with the stream into
Lake Roland the main reservoir.　The Court held that
this was an unreasonable and unauthorized use of the
stream, an invasion of the rights of the riparian owners,
which must be acquired by purchase or condemnation
under the law, before the city could so use it, and affirmed
an order granting an injunction, to prevent such threat-

ened use without such purchase or condemnation. It does not appear to us that anything said in that case has a material bearing upon the question now under consideration. In *Eaton vs. Railroad Co.*, 51 *N. H.*, 504, a railroad company having the usual corporate powers, in constructing its road had cut through a natural ridge or barrier, which had protected the plaintiffs' meadows from the effects of the floods and freshets of a neighboring river, in consequence of which the water by flowing through this cut carried sand, gravel and stones upon their land, and the Court held that this was a *taking* of private property within the meaning of the constitutional prohibition. But assuming, (without expressing an opinion to that effect,) that an injury of this character inflicted in the mode and *to the extent* described in that case, would amount to such taking, still that would not affect our decision of the present case, because as the question is presented to us, and so far as the record discloses, the injury here complained of, besides proceeding from a very different cause, does not appear to have gone to such an extent. The point of the decision of the Supreme Court in *Pumpelly vs. Green Bay Co.*, 13 *Wallace*, 166, is that the overflowing of land by backing water upon it, by means of dams, is a *taking* within the constitutional provision. The Court expresses the opinion that the decisions, which have exempted municipal and other corporations from liability for consequential damages to private property, have gone to the uttermost limit of sound judicial construction, and in some cases beyond it, and they insist "that it remains true that where *real estate* is actually *invaded* by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to *effectually* destroy or impair its usefulness, it is a taking within the meaning of the Constitution, and that this proposition is not in conflict with the weight of judicial authority in this

country, and certainly not with sound principle." They concede however, that this principle of exemption sustained by the authorities of the State Courts "is a sound one, in its proper application to *many injuries to property so originating."* This concession is quite sufficient to cover the present case, for there is nothing in the record to show that the increased washings into this race, resulting from the extension of Bedford street, and other improvements in that locality, could not have been removed by a very slight expenditure of labor and money. In fact, the testimony offered by the plaintiff, shows that he usually cleaned the race twice a year, but did not clean it within the past year, and that only one of his mills has been running since the first of March, 1876, *because the race was filled by the washings of the street by means of hose attached to fire-plugs,* done under the direction of the then mayor of the city, and that before that time the city authorities had caused the streets to be regularly scraped, and the dirt therefrom carted away. From this the inference is plain, that the stoppage of the mill was occasioned by this washing of the streets, which the Court below very properly held to be an unauthorized act of the mayor, for which the city was not responsible, and not by the increased washing, or flow of surface water, caused by the extension and improvement of Bedford street.

It follows from what we have said that, in our opinion, there was error in the Court's action upon the instructions we have been considering, and for this error the judgment must be reversed.

Another question is presented by the rejection of the defendant's tenth prayer. By the Act of 1864, ch. 121, the city of Cumberland was vested with the power to introduce water therein, and to pass ordinances regulating the introduction and *use* of the same. Under this authority works were constructed by which water from the Potomac river was forced and carried into the city on the east side

of Will's creek to the extent of about one million gallons per day. According to the testimony on the part of the plaintiff this water is very largely used for water closets and washing the pavements of the streets, and a portion of it so used is carried by the gutters and sewers mixed with the dirt and filth of the streets into this race to the damage of the plaintiff. The defendant's tenth prayer is to the effect that the city has at all times the right to use or authorize its citizens to use its hydrants in washing its streets, even though mud is washed thereby into this natural water-course or mill-race. We have not been furnished with any ordinance passed in pursuance of the power to regulate the use of this water so that the Court could determine whether it was reasonable, or so unreasonable as to be a *plain abuse* of the power and therefore void. All that we can say is that an ordinance permitting the citizens to use the water for household and domestic purposes, and also to sprinkle the pavements and streets in front of their houses, as is usually done in cities in warm and dry weather, would be a proper exercise of the power and for any injury resulting from such use of it (if any could possibly so result) the city would not be responsible. But the broad terms in which the instruction asked for is couched, might justify an abuse of the power, and we are of opinion the Court committed no error in rejecting it.

The result is that the judgment must be reversed, and as the case seems to us to be one in which a *procedendo* should not issue unless upon special application, it will not be issued until applied for.

*Judgment reversed.*

(Decided 19th December, 1878.)

ALVEY, J., filed the following opinion:

In this case, I concur in the conclusion that the judgment appealed from should be reversed, and I do not see

that there is any such state of facts disclosed by the record as will entitle the plaintiff to maintain his suit. But there are several propositions maintained in the opinion of this Court to which I cannot assent. For instance, the leading proposition, that a municipal corporation is not liable to an action for consequential damages to private property or persons, where the act complained of is done by it under authority conferred by a valid Act of the Legislature, if there be no negligence in doing the act, although the same act if done without legislative sanction would be actionable. With all due respect, I do not think that such proposition can be maintained either upon principle or any binding authority. While an Act of the Legislature may be perfectly valid simply as an authority for doing acts of a certain character generally, it does not necessarily follow that particular individuals should be made to suffer all the consequences that may result from doing any particular act of the denomination authorized by the statute. A statute may authorize the making of grades and drains for the benefit and improvement of the town, and to that extent be perfectly valid, yet if, by making a particular grade or drain, the private property of an individual is flooded and rendered useless, or is thereby seriously injured, the silence of the statute upon the subject can offer no reason why he should not be compensated. In such case, it is not to be presumed that the Legislature intended that the statute should be made to operate to the detriment, it may be to the ruin, of the citizen. The power delegated should be exercised with due respect to the rights of private property; (*Perry vs. Wilson,* 7 *Mass.,* 393; *Gardner vs. Village of Newburgh,* 2 *John. Ch. Rep.,* 162;) and if the municipal corporation invades those rights, though it be acting under a general power derived from the Legislature, it should be made to respond in damages in like manner and to the same extent that an individual would be liable for a similar injury; that is to say, for the actual damage sustained.

Without going into any particular statement of the doctrine upon the subject, I only propose to say, that, in my opinion, the true principle, with its proper limitations, with respect to the liability of municipal corporations for wrongs of the character of that complained of in this instance, is that laid down and maintained in the cases of *Proprietors of Locks vs. Lowell,* 7 *Gray,* 223; *Haskell vs. New Bedford,* 108 *Mass.,* 208; *Brayton vs. City of Fall River,* 113 *Mass.,* 218; *Franklin Wharf Co. vs. Portland,* 67 *Me.,* 46; *Ashley vs. City of Port Huron,* 35 *Mich.,* 296; *Pettigrew vs. Village of Evansville,* 25 *Wis.,* 223. See also *Gardner vs. Village of Newburgh,* 2 *John. Ch. Rep.,* 162, and *Pumpelly vs. Green Bay Co.,* 13 *Wall.,* 166.