A. L. LAKEY CO. *v.* CITY OF KALAMAZOO.

1. MUNICIPAL CORPORATIONS — OBSTRUCTING WATERCOURSE — LIABILITY.

Arcadia creek which runs through the city of Kalamazoo was obstructed by the contents of a warehouse erected over it at a point where the owner of the warehouse owned both banks and the bed of the stream. The city was not aware of the obstruction until the contents of the warehouse were removed, and it was able to reach the bed of the creek from the inside, when it cleaned the stream for sanitary purposes. The building did not interfere with the natural flow. The creek was not used for sewerage, and the city had no control over it except under its police power to clean the same, and under its charter to regulate, improve, alter, widen, or change its channel on making compensation for the property taken therefor. *Held*, that the city was not liable for the obstruction.

2. SAME—NATURAL ACCUMULATIONS.

A city is not liable for damages caused by obstructions in a creek flowing through it, not used as an outlet for its sewers, caused by accumulations washed into it from streets and buildings within the natural drainage area of the creek, and it is not its duty to keep the same at its natural depth and width.

Error to Kalamazoo; Adams, J. Submitted November 16, 1904. (Docket No. 97.) Decided December 30, 1904.

Case by the A. L. Lakey Company against the city of Kalamazoo for the flooding of plaintiff's premises. There was judgment for plaintiff, and defendant brings error. Reversed.

The appellant's statement of the case is not disputed, and we therefore adopt it. It is as follows:

This is an action for permitting Arcadia creek to over-flow its banks and flood the plaintiff's cellar. Plaintiff had verdict and judgment for $1,760. Arcadia creek is a natural watercourse, draining a portion of the area of the defendant city. The city is situated in a valley. The creek has always carried off the rainfall within its natural area, and, as the community grew, streets were paved and laid out across the creek, and the gutters from the streets were connected with it. Later, as the city grew, underground waterways known as "storm sewers" were installed (which served substantially the same purpose as the old gutters) which were also connected with the creek, but no sewer or gutter connected with it drained any area except the natural watershed. The creek passes through a thickly settled business portion of the defendant city, and substantially all the large buildings of the city are within the drainage area of the creek. The territory occupied by these buildings has been gradually built up, and the water which falls upon the roofs of the buildings collects and is discharged in some instances into the sewers, but usually on the pavements, from whence by gutter or storm sewer it finds its way into the creek. On June 18 and July 2, 1902, heavy rains fell within the drainage area, and the creek overflowed its banks at or near the plaintiff's place of business, and the water ran into its cellar, whereby it claims damage.

The city, although it has never admitted that it was bound so to do, has, as a health measure, always cleaned the watercourses within the city, and very shortly before the 18th of June, 1902, the creek was thoroughly cleaned by the city employés, with the one exception that at the

building occupied by the Harrow Spring Company, which faces on Edwards street in said city, and which is but a few rods from plaintiff's place of business, the workmen were unable to reach the bed of the creek, because for a considerable distance there were private storage sheds built entirely over it. The sheds had been over the creek for a number of years, and entirely upon private property, and there was no method of cleaning it at this place unless the floor of the sheds was removed. Upon inspection, the city employés discovered that there were stored within the sheds harrow teeth and other iron material, and in such a manner that it was impossible for them to reach the bed of the creek. After the floods the Harrow Spring Company moved from their place of business, and then the floor of these sheds was taken up, and it was discovered that harrow teeth had fallen through the floor into the creek in such a manner as to catch debris and drift material, making a dam, which undoubtedly to some extent caused the flood.

The court instructed the jury that the city had the legal right to turn the surface waters of this watershed of the creek into the creek, and that it had turned no more of the surface water into it than it was justified in so doing. The court also instructed the jury that if they found that the city permitted the creek " to become and be so obstructed on the days in question, and that the obstruction caused the creek to overflow its banks and damage the plaintiff's property, then the plaintiff would be entitled to recover; provided you further find that the rain storms which happened on those days were such as might ordinarily have been expected to occur in this latitude, although happening at rare intervals." He further instructed them that if the rainfall was unprecedented, and would have caused the creek to overflow notwithstanding the obstructions, then the defendant was not liable. He also instructed them that it was the duty of the city to keep the creek reasonably clear and free from obstructions, and that it was responsible for the obstructions by the Harrow Spring Company.

*Harry C. Howard* (*William R. Fox*, of counsel), for appellant.

*Osborn & Mills*, for appellee.

Grant, J. (*after stating the facts*).   The overflow of the creek so as to flood the basement of plaintiff's building was caused either by a great rainfall, or by the obstruction of the Harrow Spring Company, or both combined. Of course, but for the heavy rains the overflow would not have occurred.   It is very probable that but for the obstruction the water would have remained within the banks of the creek.   The evidence is that no such flooding had before been known.   Plaintiff's manager testified that it had occupied the building ever since it was built; that it had never had a flood to that extent before; that only once before had the water reached its basement, and that was about two years previous; that that overflow was caused by a blockade in the bed of the creek by a firm named Bush & Patterson, who were building a mill, and had lumber and brick piled across the creek.   After the first flood plaintiff took no steps to remove its material from its basement, because, as its manager testified, "they did not think they would have another flood right on the heels of the first.   We never had any damage before; it had never been flooded before; and, basing my judgment upon the line of my former experience, I certainly did not think it would happen so soon again."

The rule is conceded to be that a municipality is not responsible for damages caused by unexpected and unusual rainfalls, but only for those which experience has shown are liable to occur.   *City of Coldwater* v. *Tucker*, 36 Mich. 474; *Seaman* v. *City of Marshall*, 116 Mich. 327.

It was not claimed by the defendant in the court below, and is not now claimed, that the court erred in leaving to the jury the question whether the rainfall was unprecedented, or one which might have been expected to occur, although happening at rare intervals.

Two questions are raised: *First.* Was the defendant liable for the obstruction of the creek by the Harrow Spring Company? The defendant did not cause the obstruction. It was not aware of it until after that company had removed the contents of its warehouse, built over the creek, and the defendant had been able to reach the bed of the creek from the inside, the only way it appears by which it could be reached and cleaned. The Harrow Spring Company owned both banks and the bed of the stream. So long as it did not interfere with the natural flow of the water, it had the right to erect buildings over it. The building itself did not interfere with the natural flow. The defendant had no control over the creek (except that inherent in municipal corporations under the police power) to cause it to be cleaned for the protection of the health of its inhabitants. Even under its charter it could only "regulate, improve, alter, widen, or change the channel of Arcadia brook, * * * on making compensation to persons whose property may be taken for such purposes." The fact that it had caused the stream to be cleaned for sanitary reasons did not make it the duty of the city to protect owners of land from the overflow of water naturally emptying into it. The creek had not been appropriated by the city for the purpose of sewerage. It was no more liable in damages to riparian owners for water running into it, under the circumstances of this case, than it would be for emptying its surface water into the Kalamazoo river, where its general sewerage is conducted. The riparian owners along such streams are entitled to use them for any legitimate purpose so long as they do not affect the rights of other riparian owners or cause a nuisance dangerous to the health of the inhabitants. *Knight* v. *Barr*, 130 Mich. 673. It follows that the instruction of the court that the defendant is liable for the obstruction of the Harrow Spring Company is erroneous. *Haynes* v. *Town of Burlington*, 38 Vt. 350; *Coonley* v. *City of Albany*, 132 N. Y. 145.

*Second.* Was the defendant liable for obstructions arising from the flow of water into the creek ? While the instruction of the court is not very specific as to the character of the obstruction for which the defendant is liable, we infer from its general character, and from briefs of counsel, that it was held responsible for any obstructions caused by the accumulation of sand and mud in its bottom which the water from the streets and buildings washed into it, and that it was the duty of the city to keep the creek at its natural depth and width.

Arcadia creek is a natural watercourse. As the city grew, the watershed of the creek became covered with buildings. Parties who owned land on both sides of it erected buildings over it, as they had the legal right to do. Paved streets became necessary. The speedy discharge of the water from the buildings and streets into the creek was essential to the business, comfort, and health of the inhabitants of the city. The authorities are apparently unanimous in holding that under such circumstances the city had the legal right to construct pavements and storm sewers to speedily carry off the water into the creek through which it was emptied into the river of Kalamazoo, a short distance away. In this process some dirt and material, necessarily deposited upon the pavements, would be carried into the creek. Some of this dirt and material would perhaps settle in the bottom of the creek and lodge along its banks.

The cities and villages in this country are usually situated along the banks of rivers and small streams, into which the water falling upon their paved streets and buildings must be conducted. For the dirt and material thus carried into such streams, the municipalities are not liable to the riparian owners, or to others living in the vicinity. If any such owner is damaged thereby, it is damnum absque injuria. Neither does the law impose upon the municipality the duty to keep the bed of the stream at its original depth and width. As a measure of health, the municipality undoubtedly has the power to clean or cause to be cleaned the bed of the stream and thus accelerate the flow

of the water, but the municipality has no other control
over it. It owns no land along the banks. The creek is
not a trunk sewer owned by the municipality.

Under the facts of this case the defendant is not liable.
Its nonliability is founded in sound reason, and is sup-
ported by the authorities. *Wilson* v. *City of Waterbury*,
73 Conn. 416; *Wheeler* v. *City of Worcester*, 10 Allen,
603; *Mayor, etc., of Cumberland* v. *Willison*, 50 Md.
138; *Fair* v. *City of Philadelphia*, 88 Pa. St. 309; *Kav-
anagh* v. *Brooklyn*, 38 Barb. 232; Gould on Waters, §
270.

The learned counsel for the plaintiff cite and rely upon
*Ashley* v. *City of Port Huron*, 35 Mich. 296; *Rice* v.
*City of Flint*, 67 Mich. 401; *Seaman* v. *City of Mar-
shall*, 116 Mich. 327; *Manning* v. *City of Lowell*, 130
Mass. 21; *Brayton* v. *City of Fall River*, 113 Mass.
218; *O'Brien* v. *City of St. Paul*, 18 Minn. 176; *Clay*
v. *City of St. Albans*, 43 W. Va. 539; *Noonan* v. *City
of Albany*, 79 N. Y. 470; *Barton* v. *City of Syracuse*,
36 N. Y. 54; *Stanchfield* v. *City of Newton*, 142 Mass.
110; *Parker* v. *Nashua*, 59 N. H. 402; *Mayor, etc., of
Waycross* v. *Houk*, 113 Ga. 963.

In *Ashley* v. *City of Port Huron* the city cut a sewer
in such a manner as to cause a collection of large quanti-
ties of water upon the plaintiff's land which would not
otherwise have flowed there.

In *Rice* v. *City of Flint* the city made a dam by rais-
ing the grade of the street, so that the water overflowed
the plaintiff's premises.

In *Seaman* v. *City of Marshall* the city was held
negligent in not providing reasonably efficient means to
carry off the water which should reasonably have been ex-
pected to accumulate.

In *Manning* v. *City of Lowell* the territory which was
drained of its surface water was very much greater than
the extent of territory which would be thus naturally
drained without the intervention of the artificial means

constructed by the city. In other words, the city took water which would not naturally flow upon defendant's land, and discharged it upon his land.

In *Brayton* v. *City of Fall River* the city drained by its system of sewers a territory of 60 or 75 acres, and emptied it into a creek, whereas only about 15 to 20 acres naturally drained into it.

In *O'Brien* v. *City of St. Paul* the area of the drainage through the sewer is not clearly shown. It is stated that by means of the sewer the city conducted to and emptied upon the plaintiff's premises a greater body of water than the natural flow of water through the watercourse—wore away the banks and soil to a much greater extent than would have been caused by any stream naturally flowing through said watercourse. If it is meant by this that a municipality cannot pave its streets and construct storm sewers so as to convey water more rapidly into the creek than it would naturally flow, it is against the clear weight of authority, and against the instruction of the court in this case.

In *Clay* v. *City of St. Albans* we gather from the statement of the case' that the city, by its gutters and drains, collected surface water and cast it in a body onto plaintiff's land. It is not a case of draining into a creek or natural watercourse.

In *Noonan* v. *City of Albany* the water was collected from the lands and streets of a municipality into an artificial channel and discharged upon plaintiff's lands. The defendant in that case, by means of sewers and manner of grading, concentrated the surface water and sewage of a large territory and discharged it in one body into a ravine where a small rivulet formerly ran.

*Barton* v. *City of Syracuse* involves the duty of the municipality to keep its sewers in proper repair and prevent their becoming filled with dirt and rubbish, thus impeding the overflow of the water, and causing it to set back upon the lands of lot owners. *Stanchfield* v. *City of Newton* is a similar case.

In *Mayor, etc., of Waycross* v. *Houk* the plaintiff sought to enjoin defendant from continuing or from extending a main sewer so that the sewage would be discharged directly upon her land. The basis of the decree in that case was that the nuisance should be abated as dangerous to life and health.

In *Parker* v. *Nashua* the liability was based upon the negligent management of the municipality in not keeping a culvert free from obstructions.

We are of the opinion that those cases do not apply to this one.

Judgment reversed, and new trial ordered.

The other Justices concurred.