GRAND RAPIDS & INDIANA RAILWAY CO. *v.* VILLAGE OF MORLEY.

1. WATERS AND WATERCOURSES—NEGLIGENCE—DAMS—DEFECTIVE CONSTRUCTION—RAILROADS.

> Under allegations of a declaration in a case against a village and a private owner for damming the waters of a stream and negligently permitting them to break away and flood the right of way of a railroad company, the plaintiff failed to state a cause of action against the village by charging that defendants jointly constructed and maintained the dam, where other averments specifically showed the arrangement by which the village and the private owners constructed and maintained the obstruction, and that the village merely availed itself of the plans of such owners to use the dam as a roadway and foundation for a bridge across the stream, paying a consideration to them for building the bridge.

2. SAME—PLEADING—DECLARATION.

> And it must be presumed, in the absence of averments to the contrary, that the stream is navigable and that the dam was lawfully built with the consent of the board of supervisors.
>
> BIRD, J., and HOOKER and STONE, JJ., dissenting.

Certiorari to Mecosta; Withey, J., presiding. Submitted January 4, 1911. (Docket No. 18.) Decided May 8, 1911. Rehearing denied September 29, 1911.

Case by the Grand Rapids & Indiana Railway Company against the village of Morley and William Hugh, Sr., for damming a stream and negligently permitting the waters to break away and flood plaintiff's right of way. An order overruling a demurrer of the defendant village is reviewed by defendant on certiorari. Reversed.

*Cogger & Broomfield*, for appellant.

*James H. Campbell*, for appellee.

STONE, J. This case is here on certiorari issued on ap-

plication of the village of Morley to review the order of
the circuit judge overruling the demurrer of the village
to the declaration in an action on the case against said
village and William Hugh, Sr., to recover damages for
alleged injuries to the property of the plaintiff caused
by the breaking away of the water of a stream called the
Little Muskegon river, which was confined in a pond by
an embankment claimed to have been constructed by the
defendants on the line of a public street in the village of
Morley.  The declaration covers 34 pages of the record,
and is too lengthy to be inserted here.  The wrong therein
complained of is the obstruction of a natural watercourse
by means of an embankment by which the waters were
prevented from flowing on in their natural channel, and
were confined in a large pond, and, being so held, they
broke down the embankment and rushed in a great flood
onto plaintiff's land and undermined its track and bridge
across the stream so that it went down under a passing
train, resulting in great damage.

The Little Muskegon river flows southwesterly through
the village of Morely, through the S. E. ¼ of the S. E. ¼
of section 25, township 13 N., range 10 W., to the Muske-
gon river.  Upon said 40 acres the river flows through a
valley about 500 feet wide.  This valley is about 12 feet
below the natural surface of the land on both sides of the
river.  The flow of water in said stream has been in an
established channel and permanent and continuous for
upwards of 50 years, except for the obstruction com-
plained of.

The street embankment extending north and south, and
wholly within the limits of the village, was erected and
maintained across the valley and watercourse within and
upon the lines of a street called Cass street, some 220 feet
east and above the railroad track and bridge of the plain-
tiff.  It was composed of earth and sand about 12 feet
high, 20 feet wide at the top, and 58 feet wide at the base.
Upon and over the channel of the river the embankment
filled up the stream and was carried up about six feet,

leaving an opening about 42 feet north and south and 6 feet deep in the top of the embankment. In that opening was placed a timber structure consisting of plank floors and side walls, and the opening was closed by wooden gates on the upper or east side of the opening to the height of the embankment. A highway bridge was built over and across the said opening and timber structure, the ends of the bridge resting on the side walls of the opening, and on the embankment on each side of the opening.

The plaintiff alleges that the embankment and the wooden structure therein and the highway bridge constituted a barrier across the valley and watercourse 12 feet high, and obstructed the flow of waters in the natural channel of the stream and collected and retained them in a large pond on the east side of the barrier, filling the valley with water to the depth of twelve feet, the pond extending east from the barrier, to wit, one mile. The plaintiff owns a right of way 100 feet wide at this point upon which its embankment, bridge, and track were built in 1869.

In June, 1872, A. B. Watson had become the owner of the 40 acres excepting the railroad right of way. In July, 1873, said Watson and Nelson Higbee were constructing a sawmill on the south side of the river on the west side of Cass street. To operate the mill by water power, said parties proposed to build a dam across the river. At the same time the village wanted to fill up Cass street across the valley so as to bring the grade of the street in that part up to the grade on either side. An arrangement was made between the village and Watson and Higbee by which the embankment and dam should be built upon the street, and carried up to the grade of the street on either side of the valley, the surface of the embankment to be used as a street, and the whole to be so constructed as to constitute a dam to retain the waters of the river in a pond to furnish water power for the operation of the mill. The village paid Watson and Higbee as agreed in their contract. The embankment and bridge were constructed in

1874, and down to the time of the injury complained of, in January, 1907, were used as a highway, and maintained and reconstructed by the village. In 1882 a gristmill had been erected on the north side of the valley on land deeded by the said Watson. In June, 1885, the defendant William Hugh, Sr., had become the owner of an undivided one-half of the property, and in 1900 he became the sole owner thereof. It is alleged that in 1885 the embankment and dam and highway bridge were in part broken down and washed away, and the same were reconstructed, restored, and repaired by Higbee and Hugh and the village, and the same so maintained until the breaking way in January, 1907, and the injury complained of. By reason of said obstruction and because said barriers were not of sufficient strength, and the openings were insufficient to allow the waters to run off, the water so collected broke the said barrier, rushed down, and washed away the support of plaintiff's bridge.

The duties of the defendants and the specific acts complained of will more fully appear by the following excerpt from the declaration:

"(12) Thereupon, to wit, on the 12th day of June, 1872, at the said village of Morley, the premises being as herein stated, it became and was at all times thereafter the duty of the said village of Morley and its successors, and of the said Amasa B. Watson and Nelson Higbee and their grantees:

"(*a*) Not to obstruct or permit or suffer to be obstructed, by any means whatever, the said natural watercourse, and the free flowage of the waters thereof in the natural channel at any place within or upon the said S. E. ¼ of the S. E. ¼ of section 25, nor at any point within the territory of said village, or within 1,000 feet east of the said railroad embankment and track.

"(*b*) And to prohibit and prevent the obstruction, by any means whatsoever, of the said watercourse, and of the free flowage of the waters thereof in the natural channel at any place within or upon the said S. E. ¼ of the S. E. ¼ of section 25, or at any place within the territorial limits of said village, or within 1,000 feet east of the said railroad.

"(c) And to keep the said watercourse within the said S. E. ¼ of the S. E. ¼ of section 25, and within the territorial limits of said village, open and free from all obstructions, so that the waters thereof would flow freely and unobstructed in the natural channel upon and across the said S. E. ¼ of the S. E. ¼ of section 25, and without injury to the land, roadbed, bridge, and track of the plaintiff upon said description.

"(d) And if any embankment or barrier were built across the said valley for any lawful purpose, public or private, to leave an opening therein upon and within the limits of the channel of said watercourse, through which the waters thereof would flow freely and unobstructed.

"(e) And if any embankment or barrier or dam or bridge or structure were built for any lawful purpose, public or private, across said valley and stream, whereby the flow of the water in the natural channel would be obstructed, to construct and permit the construction of the same only to a reasonable and safe height so that the waters obstructed and retained thereby would collect and be held only in such quantities as would be reasonable and safe, and not in such quantities as might endanger, or injure, the said railroad embankment, bridge, and track by breaking away and flowing thereon, and to construct the same of such materials and dimensions, and in such manner, that it would be of sufficient strength to retain and hold the waters obstructed, collected, and retained thereby so that they would not break through the same, and to leave sufficient openings therein so that the waters would run off through such openings when they would rise behind such embankment, or structure, to the level of such openings, and not collect in unreasonable, unsafe, and dangerous quantities, and if gates were placed in such openings, forming when closed part of the barrier by which the waters were obstructed and retained, to so construct and maintain the same that they could be promptly and easily opened, if, for any reason, the volume of the waters held back by such barrier should at any time increase and rise, and release the waters and allow them to run away and not be retained in unsafe and dangerous quantities, and to keep the said embankment, structure, barrier, and gates at all times in full, proper, efficient, and safe condition of repair.

"(f) And of the defendant the village of Morley not to construct, or place or permit or suffer any one to construct

or place, any embankment, dam, bridge, or other structure or barrier or obstruction of any kind in, across, or upon the said watercourse at any place within the territorial limits of said village and east of the said railroad, which would in any way obstruct the said natural watercourse and the free flowage of the waters thereof in the natural channel.

"(g) And of the defendant the village of Morley not to construct, or place, or permit or suffer any one to construct or place, any embankment, dam, bridge, or other structure or barrier or obstruction of any kind in or upon the said watercourse upon or within the lines of said Cass street in the said S. E. ¼ of the S. E. ¼ of section 25 which would in any way obstruct the said natural watercourse and the free flowage of the waters thereof in the natural channel.

"(h) And of the defendant the village of Morley not to construct or place or permit or suffer any one to construct or place any embankment, dam, bridge, or other structure, or barrier, or obstruction of any kind in, across, or upon the said watercourse upon any public street, or other public land, or upon any private lands, within the corporate territorial limits of said village which would in any way obstruct the said natural watercourse and the free flowage of the waters thereof in the natural channel.

"(i) And of the defendant the village of Morley in grading Cass street across said valley in the said S. E. ¼ of the S. E. ¼ of section 25 to the level of the land on each side of said valley, by means of filling, grading, embankment, or otherwise, to leave the said watercourse unobstructed thereby, and to leave the same open and cross the same by bridge so that the waters in said watercourse would flow freely and unobstructed in the natural channel.

"(j) And of the defendant the village of Morley not to permit any embankment, or dam, or barrier, or obstruction of any kind whatsoever, to be constructed, placed, or maintained upon or within the limits of Cass street upon and across the said S. E. ¼ of the S. E. ¼ of section 25 by which the said watercourse would be obstructed, or the free flowage of the waters thereof through the natural channel would be prevented, for the purpose of forming a pond or collecting the waters of said stream to supply water power for the operation of any mill, factory, or machinery, or for any other private purpose whatsoever.

"(k) And of the defendant the village of Morley not to permit any embankment, or dam, or barrier, or obstruction of any kind whatsoever to be constructed, placed or maintained within or upon any land within the corporate territorial limits of said village by which the said watercourse would be obstructed or the free flowage of the waters thereof through the natural channel would be prevented for the purpose of forming a pond, or collecting the waters of said stream to supply water power for the operation of any mill, factory, or machinery, or for any other private purpose whatsoever.

"(13) Nevertheless the defendant the village of Morley and the defendant William Hugh, Sr., grantee of said Amasa B. Watson and Nelson Higbee, disregarded all and singular the said several duties imposed upon them in the premises, and did obstruct said natural watercourse and prevent the free flowage of the waters thereof in the natural channel by means of an embankment and dam and structure, barrier, and highway bridge by them erected and maintained, and permitted and suffered by them to be erected and maintained upon and across the said valley and watercourse upon the said S. E. ¼ of the S. E. ¼, and within and upon the lines of Cass street on said description, and on a line, to wit, 220 feet east of said railroad embankment, roadbed, bridge, and tracks, by which the waters of said stream were obstructed and retained in a large pond on the east side of said barrier, formed by the embankment and dam and structure and highway bridge, and the waters so retained broke down and washed away the said barrier, and ran upon the said land of the plaintiff, and injured said embankment and bridge and track, and other property of the plaintiff as hereinafter stated.

"(14) On, to wit, the 7th day of October, 1873, the said Amasa B. Watson and Nelson Higbee, desiring to build a dam upon and across the said stream on the S. E. ¼ of the S. E. ¼ of section 25, east of the railroad, to obstruct the said stream and the flow of water therein and to retain and hold the waters of said stream in a pond, to furnish water power for the said sawmill and other mills and machinery then existing, or thereafter to be constructed, the said village of Morely consented thereto and gave permission for the location, construction, and maintenance of such a dam across said stream on said description of land upon and within the lines of Cass street pro-

duced, and extended from First street south to the south territorial limits of the village, and joined with the said Watson and Higbee, and thereafter with their grantee, the defendant William Hugh, Sr., in the construction, reconstruction, and maintenance of an embankment and dam and structure and highway bridge upon such line, and the same was constructed and completed within the lines of Cass street produced on, to wit, the 1st day of July, 1874, and was thereafter maintained and used to provide water power for said sawmill and for a flouring mill thereafter built on the north side of said stream east of the railroad, and as a street and highway in said village across said S. E. ¼ of the S. E. ¼ of section 25, and said stream to the south line of the territorial limits of the village, and thence continued into the territory south of the village, and the same has been since, to wit, the 1st day of July, 1874, used and traveled as such street and highway continuously by all persons in going with teams and on foot between the territory in said village and beyond south of said stream, and the village and territory north of the same, and has been, during that period, the only means of travel between said territory north of the stream and the territory south of the stream within the village across the said valley and stream.

"(15) On the 7th day of October, 1873, the board of trustees of the village of Morley adopted a resolution as follows:

" 'Resolved by the board of trustees of the village of Morley that the proposition of Amasa B. Watson and Nelson Higbee to build a bridge across the south branch of the Muskegon river in the village of Morley and at a point in said village where Cass street crosses said river on the top of the dam already under construction by the said A. B. Watson and Nelson Higbee. Said bridge to be built in a good, substantial, workmanlike manner, of sufficient width and strength to admit of the passage of loaded teams both ways at the same time, and to grade and fill up Cass street to the proper level with the bridge, and of the width of twenty feet on top, for the sum of $800.00, three hundred of which to be paid on or before the 1st day of November, 1873, the balance to be paid in two village orders, one of three hundred to become due on the 20th day of October, 1874, and the other of two hundred to be due on the 20th day of October, 1875, both drawing interest at ten per cent., be and the same is hereby accepted, and the president and clerk of this board are hereby instructed to sign a contract and draw said order to that

effect with the said A. B. Watson and Nelson Higbee for and on behalf of this board.'

" (16) On the 7th day of October, 1873, the village of Morley, by its board of trustees as parties of the first part, made and entered into an agreement with the said Amasa B. Watson and Nelson Higbee, parties of the second part, as follows:

" ' This article of agreement made and entered into this seventh day of October, A. D. 1873, by and between the board of trustees of the village of Morley, Mecosta county, State of Michigan, parties of the first part, and Amasa B. Watson and Nelson Higbee, of the same State, parties of the second part. Whereas, at a session of the board of trustees held in and for said village on the seventh day of October, A. D. 1873, the president and clerk of said board of trustees were authorized and instructed by said board to make and execute the proper contract with the said parties of the second part for the construction of a bridge across the south branch of the Little Muskegon river at a point in the village of Morley where Cass street in said village crosses said river. Witness, that for and in consideration of the sum of eight hundred dollars to be paid to the parties of the second part as hereinafter mentioned, the said parties of the second part hath agreed and by these presents does agree to and with the parties of the first part that they will build and construct a bridge across the south branch of the Muskegon river at a point where Cass street in the village of Morley crosses said river, said bridge to be built in a good workmanlike manner and to be of sufficient strength and width to permit the passage of loaded teams each way at the same time, and to be built upon a good substantial foundation and in such a manner as to be of service and use at all times for the ordinary use of the traveling public as a public highway, and to be built of good and proper materials to be furnished by the parties of the second part at their own proper expense. And it is further agreed by the parties herein, that the said party of the second part, their heirs and assigns, shall at all times and at their own proper expense repair and reconstruct said bridge without hindrance or delay when the same may become damaged or injured in any manner by high water or overflowing, leakage or washing away of the dam of the parties of the second part or any part thereof in any manner whatsoever.

" 'And it is further agreed for and in consideration whereof that the said parties of the second part shall fill in and grade up Cass street to the proper level with said bridge and at a width of at least twenty feet on the top, and all to be completed on or before the 1st day of January, A. D. 1874. For and in consideration the parties

of the first part agree to pay to the parties of the second part for the construction of said bridge and grading Cass street, the sum of eight hundred dollars to be paid in manner following, to wit, three hundred (300) dollars of said sum to be paid on or before the first day of November, A. D. 1873, three hundred dollars of the same to be paid by an order drawn on the treasurer of said village and signed by the president and clerk thereof, said order to become due and payable on the twentieth day of October, A. D. 1874, with ten per cent. interest, the remaining two hundred dollars to be paid by an order drawn for that amount on said treasurer, and signed by the president and clerk of said board and payable on the twentieth day of October, A. D. 1875, with interest at ten per cent. And, it is further agreed by and between the parties herein that the parties of the first part shall keep said bridge in repair so far as all wear and tear of the same by use of the public, and also rebuild and repair the same when damaged by fire or lightning or from any other natural cause, except by water and overflowage caused by the building of said dam. In witness whereof the president *pro tem.* and clerk of the board of trustees of the village of Morley and the parties of the second part have hereunto affixed their hands and seals the day and year first above written.

" ' JOHN T. COOK, President, *pro tem.*  [L. S.]
" ' CALVIN BURTCH, Clerk, *pro tem.*     [L. S.]
" ' A. B. WATSON.  [L. S.]
" ' NELSON HIGBEE.  [L. S.]

" ' Register's Office, Mecosta County—ss.: Rec'd for record Oct. 13, 1900, at 4 o'clock p. m., and recorded in Mis. Records, liber D., pages 228 and 229.

" ' BUELL S. WEBSTER, Register.'

· "(17) On the 10th day of November, 1873, the board of trustees of the village of Morley held a meeting at which the following proceedings were had and resolutions adopted :

" ' Morley, Nov. 10, 1873. Board met for an adjourned regular session at the residence of J. Cummer, president, absent. Trustees present, Gordon, Cook, Bickley, Roberts and Chapin. On motion of Trustee Gordon, John T. Cook was appointed president *pro tem.*, and Cal. Burtch, clerk *pro tem.* Ayes, Gordon, Bickley and Roberts. Nays, none. Minutes of last regular ( session ) read and approved. On motion of Trustee Roberts the following resolution was adopted:

" ' " Resolved by the board of trustees of the village of Morley that Cass street be and is hereby extended from the crossing at First street south to the limits of corporation, according to the original plat of said village, said street to be four rods in width."

" 'Ayes, Chapin, Gordon, Bickley, Roberts and Cook. Nays, none. Carried. * * * On motion of Roberts, the petition of Nelson Higbee and Amasa B. Watson in reference to constructing and maintaining a dam across the south branch of Muskegon river at the southern terminus of Cass street, also the overflow of First, Second and Third streets, and an alley running north and south between blocks 43 and 44, 31 and 32, 29 and 30, 17 and 18, granted and placed on file and the following preamble and resolution adopted unanimously. On reading and filing the petition of Nelson Higbee, of the village of Croton, and Amasa B. Watson, of the city of Grand Rapids, all in the State of Michigan, from which it appears that said petitioners are about to construct and maintain a dam across the south branch of the Little Muskegon river to be located on the southeast quarter of section twenty-five (25) in township thirteen (13) N., R. ten (10) west, in said county of Mecosta. That said dam is to be in the highway south of the southern terminus of Cass street as designated on the plat of said village of Morley, said dam to be twelve feet in height and designed to create a water power to be used in propelling various kinds of machinery. And it appearing that such construction and maintenance of said dam will necessarily cause the overflow of portions of Cass, First, Second, and Third streets, and also of an alley running north and south between blocks forty-three (43) and forty-four (44); thirty-one (31) and thirty-two (32); twenty-nine (29) and thirty (30), and seventeen (17) and eighteen (18), all in said village of Morley, and said petitioners pray for permission to construct and maintain such dam and thereby overflow so much and such parts of said streets and alleys as will necessarily be overflowed by reason of said dam. Therefore, resolved by the president and trustees of the village of Morley that the prayer of the said petitioners be and the same is hereby granted, and that said Amasa B. Watson and Nelson Higbee, and their heirs and assigns, be and they are hereby authorized and permitted to overflow by the construction and maintenance of said dam such parts of said streets and of said alleys as will necessarily be overflowed by such construction and maintenance of the aforesaid dam. Ayes, Chapin, Bickley, Cook, Gordon and Roberts. Nays, none. Carried. On motion of Chapin board adjourned *sine die*.

　　　　　　" 'JOHN T. COOK, Pres. *pro tem*.
　　　　　　" 'CAL. BURTOH, Clerk, *pro tem*.'

"(18) The bridge mentioned in said agreement was for the purposes only of a street. The same was constructed on or before, to wit, the 1st day of July, 1874, and at the same time the embankment across said valley on each side of said highway bridge had been constructed. Part

of the same, to wit, the surface and grade thereof, were constructed and completed by the village and fitted for travel in connection with said bridge, making a continuous street from the south territorial limits of the village north upon and within the line of Cass street as shown on the plat to the north line of section 25 through said village. The surface of said embankment and street and said highway bridge on the line thereof across said stream had at all times after, to wit, the 1st day of July, 1874, and until, to wit, the 20th day of January, 1907, been constructed and reconstructed and maintained by the village, and the expense thereof paid by the village. The said street, four rods wide from the south territorial limits of the village north to the north line of the southeast quarter of the southeast quarter of section 25, from which point it is continued north to the north line of the territorial limits of the village by Cass street, shown on said recorded plat, has at all times, to wit, since the 1st day of July, 1874, been a public street, and at all times during that period been under the full and absolute power, authority, jurisdiction, and control of the said village of Morley, and the said village has during that period fully exercised the same."

The declaration contains a minute description of the property injured, and the damage complained of. A claim was presented to the village council in accordance with the terms of section 2754, 1 Comp. Laws, but not within 60 days, in accordance with section 2775, 1 Comp. Laws, as amended in 1899 (Act No. 223, Pub. Acts 1899). The village demurred to the declaration, assigning 16 grounds of demurrer. Really but two points were discussed by counsel for the defendant village:

(1) That what the village did in the premises it did in the exercise of legislative, discretionary, and governmental functions, and that damages cannot be recovered for injuries to property therefrom.

(2) That no claim was filed by plaintiff with the village council within 60 days after the injury.

1. Embraced within the first point urged by defendant is the claim that in the declaration the defendant village is not charged either with the building of the dam, or with

active participation in the building of it.   Upon this subject defendant's counsel say in their brief:

" We have already endeavored to make our position clear that the declaration only charges the village with remaining silent and passive in reference to the construction of this dam, and that such conduct does not render the municipality liable."

In this contention we cannot agree with defendant's counsel.  A careful reading of the declaration will disclose a number of distinct allegations charging the two defendants jointly with the building and maintenance of both the embankment and the dam.   In our opinion these allegations are sufficient to support evidence entirely independent of the averments relating to the action of the council and of the contract with Watson and Higbee. Even if proof of the council proceedings and of the contract should not be sufficient to connect the village with the building of the embankment and dam, the plaintiff would be at liberty to introduce other evidence of participation under the declaration.   It should be borne in mind that we are dealing with the declaration, the allegations of which we must presume to be true.   It is not necessary for a plaintiff to prove all of the acts of negligence charged.   If any unlawful negligent act of defendants is charged which resulted in the injury to the plaintiff complained of, it is entitled to recover, although the declaration may have charged other acts of defendants as negligence, which are not proven.   *Marquet* v. *La Duke*, 96 Mich. 596 (55 N. W. 1006); *Warren* v. *Porter*, 144 Mich. 699–704 (108 N. W. 435), citing *Smith* v. *Railroad Co.*, 100 Mich. 153 (58 N. W. 651, 43 Am. St. Rep. 440); *Malkowski* v. *Olfs*, 161 Mich. 303 (126 N. W. 199).   We understand this to be a common-law action for withholding, impounding, and damming the water in this stream, and permitting the same to break away and flood the plaintiff's property, to its injury in the manner pointed out in the declaration.   Were the defendant village a natural person, there could be no question of the

sufficiency of the declaration, charging as it does the joint acts of the defendants. Such cases have been frequent in this State. *Darling* v. *Thompson*, 108 Mich. 215 (65 N. W. 754); *Scott* v. *Longwell*, 139 Mich. 12 (102 N. W. 230); 8 Am. & Eng. Enc. Law (2d Ed.), pp. 717-721.

The meritorious question is whether the village is exempt from liability on the ground that its action in the premises was the exercise of legislative, discretionary, and governmental functions. Before referring to our own decisions, we quote from Williams on Municipal Liability for Tort, § 170, pp. 284, 285, as follows:

"Under the general power, commonly conferred upon municipal corporations by charter or general laws, to lay out, grade, and improve streets and highways within the limits of their territory, they undoubtedly have the right, where they deem it necessary, to construct public ways over natural streams. But it by no means follows from this that they have also the right to close up the channel and so to obstruct the natural flow of the water; on the contrary, they are bound in such cases to construct proper and sufficient culverts or passageways for the free flow of the water.

"In determining the expediency of laying out a highway over a watercourse and in establishing the grade of such highway, a municipal corporation acts in its legislative or quasi judicial capacity, and hence is not ordinarily responsible for any injuries that may ensue therefrom to private individuals. But at this point judicial duty ends. The fixing of the size and capacity of the culvert or waterways by which the waters of the stream shall pass under the embankment or bridge, as well as the actual work of building the necessary structure, is purely ministerial in character, and must consequently be done with proper care and skill in order that liability may be escaped. The corporation has no discretion as to such matters. The rule seems to have become well settled, therefore, that, if by reason of the insufficient capacity of a culvert or of the passageways for water under a bridge, the free flow of a natural stream is so interfered with and obstructed as to cause the waters to flow back upon the land of a private person, the municipality will be liable at common law for the resulting injury, unless it appears that such insufficient capacity to carry off the water was due to other

causes than a failure to exercise due care and skill in determining their size.

" The rule of liability is the same where the backwater is caused by the negligence of the corporation in the work of constructing or in properly maintaining culverts or other passageways for the waters of a natural stream."

The liability for injury to property by the breaking away of the dam and the escape in a volume of the waters confined by it is not different from liability for backing up the waters and flooding adjoining lands.   In note 4, pp. 285, 286, it is said that:

" When a municipality and a third person, by their concurrent wrongdoing, cause the water of a natural stream to set back, they are jointly and severally liable, and hence the person injured thereby may at his option bring suit against one or both of them.   *Kansas City* v. *Slangstrom*, 53 Kan. 431 (1894) (36 Pac. 706); *Wheeler* v. *Worcester*, 10 Allen (Mass.), 591, 600."

Section 169, p. 283:

"A municipality has no right to stop up the channel of a watercourse by an embankment made in the course of grading a street under its general power to grade and improve its highways, in consequence of which the waters are caused to set back upon the land of a private person, without being answerable at common law.   *   *   *

" If the corporation has acquired a valid right to obstruct the waters of a natural stream, it must exercise due care and skill in constructing, and as well in maintaining the dam, so that no unnecessary damage shall be done to the property of riparian proprietors.   This means that it must make provision, with reference to the strength and solidity of the structure, not alone for the ordinary and usual flow of the water, but also for such extraordinary floods as may reasonably be expected occasionally to occur."

In *Sheldon* v. *Village of Kalamazoo*, 24 Mich. 383, the action was brought to recover damages for tearing down plaintiff's fences by direction of the village board on a claim that they were in the street.   Although this was for a direct trespass, yet the following language is pertinent here:

" The doctrine is entirely untenable that there can be no municipal liability for unlawful acts done by municipal authorities to the prejudice of private parties.   In this respect, public corporations are as distinctly legal persons as private corporations.   There are officers who are corporation agents, and there are municipal officers whose duties are independent of agency and with distinct liabilities.   But, when the act done is in law a corporate act, there is no ground upon reason or authority for holding that, if there is any legal liability at all arising out of it, the corporation may not be answerable.   There is no conflict whatever in the authorities on this head.   The only disagreement is concerning corporate responsibility in cases of alleged neglect of duty, and concerning the bounds of what may be termed their legislative discretion, as distinguished from their other action.   To hold that positive wrongs must in all cases be considered as purely individual and not corporate acts would be a novelty in jurisprudence.   Although not subject like corporations to the jurisdiction of courts, it has always been understood that even States and nations may be held responsible for the wrongs of their authorized agents, and the whole system of public law rests on this assumption.   The idea, therefore, that a corporate body has a discretionary power to do wrong and not suffer for it, is not in harmony with any safe principle.   There may be certain cases where there is of necessity a final discretion, but there can be no absolute discretionary power over private persons or property.   They are assured by the law of the land against any improper interference, and no public authority exists which can authorize their immunity to be taken away."

*Ashley* v. *City of Port Huron*, 35 Mich. 296 (24 Am. Rep. 552), was a case to recover damages for injury to plaintiff's property by the cutting of a sewer under the direction of the city authorities and under city legislation. Thereby water was collected and thrown on plaintiff's land, which otherwise would not have flowed thereon. At the circuit the jury was instructed that, though they should find the facts to be as the plaintiff claimed, they must return a verdict for the defendant.   The ground of the instruction was that the city, in ordering the construction of the sewer, and in constructing it, was acting in

166 Mich.—6.

the exercise of its legislative and discretionary authority, and was consequently exempt from any liability to persons who might happen to be injured. Chief Justice COOLEY, after reviewing many of the early cases, among which are some of those cited by defendant's counsel, said:

"It is very manifest from this reference to authorities that they recognize in municipal corporations no exemption from responsibility where the injury an individual has received is a direct injury accomplished by a corporate act which is in the nature of a trespass upon him. The right of an individual to the occupation and enjoyment of his premises is exclusive, and the public authorities have no more liberty to trespass upon it than has a private individual. If the corporation send people with picks and spades to cut a street through it without first acquiring the right of way, it is liable for a tort; but, it is no more liable under such circumstances than it is when it pours upon his land a flood of water by a public sewer so constructed that the flooding must be a necessary result. The one is no more unjustifiable, and no more an actionable wrong, than the other. Each is a trespass, and in each instance the city exceeds its lawful jurisdiction. A municipal charter never gives and never could give authority to appropriate the freehold of a citizen without compensation, whether it be done through an actual taking of it for streets or buildings, or by flooding it so as to interfere with the owner's possession. His property right is appropriated in the one case as much as in the other. *Pumpelly* v. *Green Bay Co.*, 13 Wall. (U. S.) 166; *Arimond* v. *Green Bay, etc., Co.*, 31 Wis. 316; *Eaton* v. *Railroad*, 51 N. H. 504 (12 Am. Rep. 147). A like excess of jurisdiction appears when in the exercise of its powers a municipal corporation creates a nuisance to the injury of an individual. The doctrine of liability in such cases is familiar, and was acted upon in *Pennoyer* v. *City of Saginaw*, 8 Mich. 534."

In *Burford* v. *City of Grand Rapids*, 53 Mich. 98 (18 N. W. 571, 51 Am. Rep. 105), which was an action to recover the value of a horse killed by being run into by a coaster sleigh on one of the streets of the city, where by ordinance coasting was permitted, the same eminent

judge, after reviewing the authorities upon the subject of governmental and discretionary power, and after holding that the plaintiff could not recover in that case, said:

"But, on the other hand, if the act which is done by a municipal corporation would be tortious if done by a natural person, the corporation is held liable for it to the same extent, and for the same reasons, that the natural person would have been. The legal protections of property are the same against artificial persons as against others, and the State itself, or any one of its municipalities, has no more power to deprive the owner of his possessions than has the private citizen. It has therefore been held that, though a city is not responsible because of any failure to provide proper sewerage, yet, if the effect of the construction of one of its public works shall be to collect water and cast it upon the land of an individual where it would not otherwise flow, the city is liable. * * * And a city has no more right to obstruct a watercourse to the prejudice of riparian proprietors than has any individual. *Lawrence* v. *Fairhaven,* 5 Gray (Mass.), 110."

See, also, *Cubit* v. *O'Dett,* 51 Mich. 347 (16 N. W. 679); *Defer* v. *City of Detroit,* 67 Mich. 346 (34 N. W. 680); *Rice* v. *City of Flint,* 67 Mich. 401 (34 N. W. 719); *Malloy* v. *Township of Walker,* 77 Mich. 448 (43 N. W. 1012, 6 L. R. A. 695); *Seaman* v. *City of Marshall,* 116 Mich. 327 (74 N. W. 484); *Phelps* v. *City of Detroit,* 120 Mich. 447 (79 N. W. 640); *Ferris* v. *Board of Education,* 122 Mich. 315 (81 N. W. 98); *Morley* v. *Village of Buchanan,* 124 Mich. 128 (82 N. W. 802); *McAskill* v. *Township of Hancock,* 129 Mich. 74 (88 N. W. 78, 55 L. R. A. 738); *Breen* v. *Hyde,* 130 Mich. 1 (89 N. W. 732); *Smith* v. *Township of Eaton,* 138 Mich. 511 (101 N. W. 661); *A. L. Lakey Co.* v. *City of Kalamazoo,* 138 Mich. 644 (101 N. W. 841, 67 L. R. A. 931, 110 Am. St. Rep. 338); *Elliott* v. *Carter,* 140 Mich. 303 (103 N. W. 600); *Schneider* v. *Township of Brown,* 142 Mich. 45 (105 N. W. 13); *Ranson* v. *City of Sault Ste. Marie,* 143 Mich. 661 (107 N. W. 439, 15 L. R. A. [N. S.] 49); *Richards* v. *City of Ann Arbor,* 152 Mich. 15 (115 N. W. 1047); *Wendt* v. *Village of Richmond,* 164 Mich.

173 (129 N. W. 38). The above authorities fully cover the subject, and hold in effect that, if the act which is done by a municipal corporation would be tortious if done by a natural person, the corporation is held liable for it to the same extent, and for the same reason, that the natural person would have been. By an examination of the cases above cited it will appear that the authorities in this State relied upon by defendant's counsel are readily distinguished from the case at bar.

2. Should the plaintiff have filed its claim within 60 days after the injury, in compliance with the provisions of section 2775, 1 Comp. Laws, as amended by Act 223 of the Public Acts of 1899 ? That section, so far as material to this case, reads:

" No village subject to the provisions of this act shall be liable in damages sustained by any person in such village, either to his person or property, by reason of any defective street, sidewalk, crosswalk, or public highway, or by reason of any obstruction, ice, snow or other incumbrance upon such street, sidewalk, crosswalk, or public highway, situated in such village, unless such person shall serve or cause to be served within sixty days after such injury shall have occurred a notice in writing upon the clerk or deputy clerk of such village, which notice shall set forth substantially the time when and place where such injury took place, the manner in which it occurred, and the extent of such injury as far as the same has become known, and that the person receiving such injury intends to hold such village liable for such damages as may have been sustained by him."

In our opinion this statute has no application to this case. It applies to cases in which persons using the street are injured by defects in the street or by reason of obstruction or incumbrance upon the street. This is not such a case. It is an action for damages caused by the obstruction of a natural watercourse.

Unless required by statute, it is not necessary to present any claim against a city or village to the council, or to file it with the clerk. The declaration alleges a substantial

compliance with the provisions of section 2754, 1 Comp. Laws, which contains no limitation of time within which such claim shall be presented.

We find no error in the record, and the order of the circuit judge overruling the demurrer should be affirmed, with costs.

Hooker and Bird, JJ., concurred with Stone, J.

Ostrander, C. J.   I regret that I am unable to agree with the conclusions stated in the opinion of Mr. Justice Stone, but am satisfied that, if everything properly alleged in the declaration were proven, liability of the village to the plaintiff would not be made out.   There are some broad general allegations in the declaration which must be read in connection with the allegations of specific action and nonaction on the part of the village as indicated by the records of the village.   We must assume from the facts stated in the declaration that the stream described therein is a navigable stream within the meaning of the constitutional provision which prohibits the erection of dams in navigable streams without the permission of the board of supervisors, and that the dam itself was a lawful structure.   It is not alleged, and it cannot be reasonably assumed from the facts set up in the declaration, that the village of Morley had anything to do with securing permission to erect the dam, or that it had any interest, directly or indirectly, in securing permission for the erection of a dam or in damming the stream.

Permission to locate a dam at or about the particular point having been given to third parties, the village of Morley availed itself of the situation and secured for itself and inhabitants the right to use the structure itself as a way and paid the owners of the dam a consideration for building a bridge supported by the dam as a part of the way.   This, it seems to me, is the substance of the allegations with respect to the defendant village.   It was the dam which interrupted the flow of water in the stream. It was the giving way of the dam which caused the in-

jury which plaintiff complains about. The village of Morley neither constructed nor maintained the dam, could not have abated or repaired it.

· The demurrer of the village should have been sustained.

MOORE, MCALVAY, BROOKE, and BLAIR, JJ., concurred with OSTRANDER, C. J.